**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Alfonso Raymond Salazar, | ) No. CV-96-85-TUC-FRZ |
| Petitioner, | ) <u>DEATH PENALTY CASE</u> |
| v. | ) |
| Dora B. Schriro, et al., [1] | ) **MEMORANDUM OF DECISION AND** |
| Respondents. | ) **ORDER REGARDING SENTENCING-** |
| | ) **RELATED CLAIMS** |

Petitioner, Alfonso Raymond Salazar, has filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. On March 31, 2000, the Court determined that a number of Petitioner's claims for relief were procedurally barred, not cognizable, or premature. (Dkt. 121.)[2] On July 16, 2005, the Court determined that Petitioner's properly exhausted conviction-related claims lacked merit. (Dkt. 169.) This Order addresses the merits of Petitioner's properly exhausted sentencing-related claims. For the reasons stated herein, the Court finds that Petitioner is not entitled to federal habeas corpus relief.

---

[1]     Dora B. Schriro, Director of the Arizona Department of Corrections, is substituted for her predecessor pursuant to Fed. R. Civ. P. 25(d)(1).

[2]     "Dkt." refers to documents in this Court's file.

1

**PROCEDURAL HISTORY**

2    On July 25, 1986, Sara Kaplan, a frail 83-year-old woman who lived alone, was

3    beaten and strangled to death in her home.  Petitioner and a co-defendant, Michael Wayne

4    Davis, were charged and tried separately on one count each of burglary, kidnapping, and first

5    degree murder.  A jury convicted Petitioner of all counts on December 14, 1987.  (ROA I at

6    222-23.)[3]  On February 9, 1988, Pima County Superior Court Judge Gilbert Veliz sentenced

7    Petitioner to death for the murder and concurrent prison terms for the burglary and

8    kidnapping.[4]  (ROA I at 397-403.)

9    While an appeal to the Arizona Supreme Court was pending, Petitioner filed his first

10   petition for post-conviction relief (PCR) pursuant to Rule 32 of the Arizona Rules of

11   Criminal Procedure.  Among other claims, the PCR petition alleged ineffective assistance of

12   counsel (IAC) at trial and sentencing.  The Arizona Supreme Court stayed the appeal pending

13   resolution of the PCR proceeding.  Following an extensive evidentiary hearing held on

14   March 9 and April 13, 1990, Petitioner sought special action relief in the Arizona Supreme

15   Court on the ground that the PCR court had erroneously denied his request to retain a legal

16

17

18   [3]      Pertinent parts of the state court record consist of the trial and post-conviction
reporters' transcripts ("RT"); a four-volume Record on Appeal ("ROA I") containing a
19   consecutively-numbered set of documents prepared by the Clerk of the Pima County
Superior Court for the direct appeal (filed May 23, 1988); a five-volume Record on Appeal
20   ("ROA II") containing a consecutively-numbered set of documents prepared for the petition
for review of the first Rule 32 petition (two volumes filed June 7, 1991, and three volumes
21   filed Dec. 26, 1991); co-defendant Davis's trial transcripts ("Davis RT"); and certified copies
22   of the Arizona Supreme Court's appellate and post-conviction dockets ("Ariz.Supr.Ct.
Record").  The Arizona Supreme Court provided these records to this Court in August 1997.
23   (Dkt. 46.)

24   [4]      Davis was tried separately, convicted on all counts, and sentenced to death by
25   Judge Veliz.  In a subsequent post-conviction proceeding, Judge Veliz ruled that Davis had
received constitutionally ineffective assistance at trial based on counsel's change of defenses
26   mid-trial.  (Dkt. 63, Ex. Q at 4.)  Thereafter, Davis was retried before a different judge,
27   convicted, and sentenced to life imprisonment.

28                                              - 2 -

expert in support of his IAC claims. (Dkt. 137 at 36; ROA II at 695.) The Arizona Supreme Court declined jurisdiction of the special action, and in January 1991 the PCR court denied relief. (ROA II at 221-24.) A petition to the Arizona Supreme Court for discretionary review of the PCR court's ruling was consolidated with Petitioner's reinstated appeal. In December 1992, the Arizona Supreme Court affirmed Petitioner's convictions and sentences and denied his PCR-related claims. *State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992), *cert. denied*, 509 U.S. 912 (1993).

In June 1994, Petitioner filed a second PCR petition. The PCR court summarily denied relief, finding the claims procedurally precluded. In November 1995, the Arizona Supreme Court denied a petition for review of the PCR court's ruling.

Petitioner initiated these proceedings in February 1996 by filing a petition for writ of habeas corpus. (Dkt. 1.) Following enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the Court stayed these proceedings pending a determination of the retroactivity of the AEDPA. (Dkt. 30.) The Court subsequently determined that the AEDPA did not apply to Petitioner's case, and Petitioner filed an amended petition in December 1997. (Dkts. 42, 62.) Petitioner filed a second amended petition adding one claim in July 1999. (Dkt. 113.)

In March 2000, the Court dismissed the following claims as procedurally barred, not cognizable for federal habeas relief, or premature: A-4, A-6 through A-11, A-13 through A-15, A-17, A-18, A-20, A-24, A-25, A-27 through A-36, B, C, D-1 through D-4 (in part), D-7, and D-8. The parties completed merits briefs on the remaining claims in March 2001. (Dkts. 137, 148, 153.) Around this same time, the Ninth Circuit Court of Appeals issued a decision in *Smith (Robert) v. Stewart*, 241 F.3d 1191 (9th Cir. 2001), that called into question Arizona's doctrine of procedural default. The Court deferred reconsideration of its procedural status ruling pending further review of *Smith*. (Dkt. 158.) In June 2002, the United States Supreme Court reversed. *Stewart v. Smith*, 536 U.S. 856 (2002) (per curiam).

1  However, it contemporaneously decided *Ring v. Arizona*, 536 U.S. 584 (2002), finding

2  Arizona's death penalty sentencing scheme unconstitutional because judges rather than juries

3  determined the factual existence of the statutory aggravating circumstances that rendered a

4  defendant eligible for the death penalty.  The Court deferred consideration of Petitioner's

5  sentencing-related claims pending a determination of the retroactivity of *Ring* and, in July

6  2005, issued a ruling on Petitioner's conviction-related claims (A-1, A-5, A-12, A-16, and

7  A-19). (Dkt. 169.)  Having determined that Petitioner was not entitled to habeas relief on any

8  of these claims, the Court now considers his remaining claims: A-2, A-3, A-21, A-22, A-23,

9  A-26, D-4 (in part), D-6, and E.[5]

10  **STANDARD OF REVIEW**

11  Petitioner filed his initial habeas petition prior to April 24, 1996, the effective date of

12  the AEDPA; therefore, pre-AEDPA standards of review govern this Court's consideration

13  of Petitioner's claims. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under pre-AEDPA law,

14  the Court presumes "that the state court's findings of historical fact are correct and defer to

15  those findings 'in the absence of convincing evidence to the contrary' or a demonstrated lack

16  of 'fair support in the record.'"  *Mayfield v. Woodford*, 270 F.3d 915, 922 (9th Cir. 2001) (en

17  banc).  The Court reviews de novo mixed questions of law and fact, as well as pure questions

18  of law. *Dubria v. Smith*, 224 F.3d 995, 1000 (9th Cir. 2000) (en banc).

19  **DISCUSSION**

20  **I.   Claim A:  Ineffective Assistance of Counsel**

21  Petitioner was represented at trial and sentencing by Patrick Hurd and William

22  Redondo, whom Petitioner argues provided constitutionally deficient representation at

23  sentencing.  Specifically, Petitioner criticizes counsel's continuation at sentencing of the

24  nonparticipation strategy pursued during trial (Claim A-21) and argues that counsel were

25

26        [5]     Claim D-5 repeats allegations of ineffectiveness already raised in Claim A and

27  is therefore not separately discussed.  (*See* Dkt. 121 at 28-30.)

28  - 4 -

ineffective for failing to consider, investigate, and present neurological, psychological, and intoxication evidence as mitigation (Claim A-22).  Petitioner also contends that counsel failed to object to the sentencing judge considering testimony from the co-defendant's trial (Claim A-23) and failed to meet with defense witnesses prior to the mitigation hearing (Claim A-26).  Finally, Petitioner asserts that Hurd lacked sufficient experience and knowledge of the law to undertake capital representation (Claim A-2) and that Redondo was ineffective for allowing Hurd to take over as lead counsel (Claim A-3).[6]

## A.    Background

Petitioner's IAC claims relate, in large measure, to the strategy employed by defense counsel at trial.  Therefore, the Court repeats herein much of the factual background set forth in its July 2005 order addressing Petitioner's guilt-phase IAC claims.

1.    Offense and Trial

The following events, as described by the Arizona Supreme Court, led to Petitioner's prosecution and conviction:

> On the day of the murder, defendant Salazar earned some money doing odd jobs.  He and his co-defendant, Michael Wayne Davis, then used the money to buy tequila and gin which they consumed during the course of the day.  Around midnight, they attended a party at the home of James Teran, who provided them with some beer.  On their way back to Davis's house, where they both lived, they broke into the victim's home by prying wrought iron bars from a window.  Later that same evening, Davis's aunt, Maria Snyder, noticed that [Salazar], who was not wearing a shirt, had scratch marks on his chest.  The day after the murder, concerned relatives of the victim asked police to check on her.  The police found her body on top of an overturned table [7].  Her TV set was still blaring.  She had been severely beaten and had also been strangled with a telephone cord.  Palm prints, fingerprints and footprints were

---

[6]    Petitioner does not directly address these allegations in his merits briefs and references no authority that an attorney's inexperience amounts to *per se* ineffective assistance of counsel.  Thus, the court does not separately discuss these claims; rather, it considers both Hurd's experience and Redondo's role in the case in its assessment of Petitioner's specific allegations of deficiency.

[7]    The table top resembled lawn furniture and likely had been supported by a metal stand found elsewhere in the bedroom.  (RT 12/9/87 at 32, 127.)

- 5 -

found in and around the house and on the wrought iron bars that had been pried from the window.

Approximately 2 months later, [Salazar] was arrested. While his story was to change at trial, he initially denied ever being in the victim's house. At trial, [Salazar] claimed that he and Davis entered the victim's home on a whim, out of curiosity, and that they believed the home was unoccupied. After Davis pried the metal bars from the window and they entered, [Salazar] said he used a pocket lighter to guide himself through the home which, he said, was dusty, full of junk and completely silent. While 'looking' in a file drawer, something that he thought was a ghost touched his arm and he fled the house in terror. After that, he said, Davis caught up with him outside and admitted that he had just killed someone in the house. Though [Salazar] claimed not to have believed Davis at the time, he nevertheless removed and discarded his shoes at that point because he knew that his footprints were all over the victim's home. He then fled barefoot across desert terrain. The following day, he said he moved out of the Davis household after learning from TV news that there really had been a murder.

The state's version of [Salazar's] role the night of the murder was considerably different than [his] and was based, in large part, on physical evidence. A fingerprint examiner established that [Salazar's] prints were found on the window grating that had been pried loose, on a telephone book inside the point-of-entry window, and on three file cabinets in the murder room. An identification technician testified concerning the bloody handprints found on one of the three file cabinets.

An expert tracker testified that the zig-zag pattern shoeprints were found both *under* the body and partially *on* the body. These prints were made by a Tiger brand running shoe, which [Salazar] admitted owning. Because the shoe prints were both under and on top of the body, they show that the shoe wearer was present both before and after the murder.

The medical examiner established that blood spatter patterns showed that the victim was beaten while on her bed and that she was still alive when she was dragged to the floor. Ultimately, she died [in the bedroom] atop an overturned table. The victim had defensive wounds on her arms and hands, and was beaten so severely that her nose was broken. She was strangled so fiercely that her Adam's apple was crushed.

*Salazar*, 173 Ariz. at 403, 844 P.2d at 570.

### The Crime Scene

The window through which Petitioner and Davis entered the victim's home led into a room located directly south of the bedroom. (RT 12/3/87 at 164; RT 12/9/87 at 130.) Petitioner testified that the lights, television, and air-conditioner were off when they entered, thereby confirming his belief that the house was vacant. (RT 12/10/87 at 113-16.) Petitioner

1   claimed that, once inside, Davis turned right and disappeared, while Petitioner stumbled

2   straight ahead using a pocket lighter to see.  (*Id.*)

3          From the point-of-entry room, the bedroom was straight ahead through a door in the

4   bedroom's south wall.  A horizontal row of file cabinets and the head of a twin bed were

5   opposite the bedroom door against the north wall; the file cabinets extended west-to-east as

6   far as the bed.  The bed was positioned north-to-south along the east wall.  A second row of

7   horizontal file cabinets ran parallel to the bed, north-to-south, slightly east of the entry door.

8   The effect of this arrangement was to separate "the bed-sleeping area from where you

9   immediately walk into the room."  (RT 12/9/87 at 78-79, 130; RT 3/9/90 at 147.)  The

10  victim's body was found lengthwise in a "very constrained" space between the end of the file

11  cabinets that separated the room and the top portion of the bed.  (RT 12/7/87 at 47; RT

12  12/9/87 at 78-79; RT 3/9/90 at 148.)  There was no evidence that the victim was beaten or

13  strangled in any room other than the bedroom.  (RT 12/9/87 at 70, 81-82.)

14         Two distinct sets of shoe prints were found outside the point-of-entry window and

15  inside the bedroom: wavy prints made by Pro-Wing shoes and zig-zag prints made by Tiger

16  shoes.  (RT 12/9/87 at 112-13; RT 12/10/87 at 88-97.)  Petitioner admitted he made the zig-

17  zag prints by wearing Tiger shoes during the crime.  (RT 12/10/87 at 91-97, 124, 155.)  A

18  zig-zag print was found on the table top underneath the victim's body.  In addition, an expert

19  tracker testified that a zig-zag print was left in a dust pattern on the victim's left arm near her

20  elbow.  (RT 12/9/87 at 32-33, 123, 138; RT 12/10/87 at 26-27.)  The bed area of the room

21  contained no zig-zag prints, but Pro-Wing shoe prints were found on top of the bed in blood

22  and at the foot of the bed in dust.  (RT 12/7/87 at 106-11; RT 12/9/87 at 115, 138; RT

23  12/10/87 at 79-80.)

24         Five feet above the victim's head, on a drawer located in the center file cabinet against

25  the north wall, Petitioner left a palm print in a red-colored substance.  In addition to the red

26  palm print, this same file drawer contained several other red-colored smears.  (RT 12/4/87

27

28                                               - 7 -

1   at 95-103; RT 12/7/87 at 33-37, 40-42, 45; RT 12/8/87 at 17-19; RT 12/10/87 at 21-22; Exs.

2   140-43, 150, 152, 155.)  Davis's fingerprint was found closer to the bed side of the bedroom,

3   on a file cabinet located east of the cabinet on which Petitioner's red palm print was found.

4   (RT 12/4/87 at 92-95; RT 3/9/90 at 147-48; Exs. 135-36.)   An identification technician

5   testified that Davis's print was consistent with a print made by someone trying to balance

6   while climbing over a body.  (RT 12/7/87 at 49.)  None of Petitioner's prints were found east

7   of the file cabinet on which Davis's print was found (*i.e.*, none were found closer to the bed

8   side of the bedroom).  (*Id.* at 48.)

9                    *Pretrial Tests and Evaluations*

10      Before trial, defense counsel Hurd asked the State to test the red-colored smears on

11   the filing cabinet where Petitioner's red palm print was found. *Salazar*, 173 Ariz. at 405, 844

12   P.2d at 572.  A criminalist tested the red-colored smears, but did not test Petitioner's red

13   palm print.  In July 1987, the prosecution sent the defense a serology report concluding that

14   the red smears were human blood matching the victim's blood type.  (RT 12/4/87 at 120-23.)

15   During pretrial preparation, defense counsel apparently overlooked the serology report.[8]

16   Counsel did not consider the report until the second day of trial, when the prosecution

17   announced its intent to call the criminalist as a witness.  *Salazar*, 173 Ariz. at 405, 844 P.2d

18   at 572.

19      Before trial, Petitioner was evaluated by two psychiatrists and one psychologist.  In

20   March 1987, the court granted the defense's request to evaluate Petitioner's "mental

21   condition at the time of the crime charged and his competence to stand trial," pursuant to

22   Rule 11.2 of the Arizona Rules of Criminal Procedure.  (ROA I at 48, 51.)  On April 13,

23   1987, Petitioner was evaluated by John LaWall, M.D., a psychiatrist-neurologist nominated

24   _____

25      [8]      In its July 2005 order, the Court determined that this failure constituted
26   deficient representation, but also found that it was not prejudicial because the report neither
     undermined the nonparticipation defense nor impacted counsel's decision not to present an
27   intoxication defense.  (Dkt. 169 at 20-33.)

28                                     - 8 -

by the State. Dr. LaWall found "absolutely no evidence of any derailment of thinking or psychotic thinking" and no diagnosable "mental illness." (Dkt. 63, Ex. WW at 1.) Although he claimed to have consumed a large quantity of alcohol and been intoxicated at the time of the crime, Petitioner provided Dr. LaWall "a clear and coherent account of his behavior and its motivation at the time of the alleged offense." (*Id.*) Petitioner specifically denied any "drug or significant alcoholic use," "health problems," "family problems," "difficulties at home as a youngster," and "history of psychiatric problems." (*Id.*) Based on his examination, Dr. LaWall concluded that Petitioner's cognitive function, including his memory, was "quite intact," and found "absolutely no evidence to suggest he did not understand the nature, quality and consequences of his actions at the time of the alleged offense." (*Id.* at 1-2.)

Three days later, Petitioner was examined by David Gurland, M.D., a psychiatrist chosen by the defense. Petitioner "vehemently denie[d]" that he was the one who murdered the victim. (Dkt. 63, Ex. VV.) Like Dr. LaWall, Dr. Gurland found "no evidence of bizarre or inappropriate behaviors." (*Id.*) With regard to Petitioner's state of mind at the time of the crime, Dr. Gurland concluded that Petitioner "appears to have been mildly to moderately intoxicated, however, he was certainly aware of the nature and quality of his acts and knew right from wrong at that time." (*Id.*) Based on the reports of Drs. Gurland and LaWall, the trial court found Petitioner competent for trial. (ROA I at 61.)

In September 1987, defense counsel retained psychologist and biofeedback practitioner Robert Crago, Ph.D., to conduct psychological testing of Petitioner, develop a personality history, and determine the existence of any neuropsychological disorders. (ROA I at 100, 109-10.) The defense sought information about Petitioner's "mental state, personality organization and cognitive functioning." (Dkt. 63, Ex. PP at 1.) Counsel anticipated these tests would enable Dr. Crago to testify "about the effects of drugs and alcohol on defendant's behavior, specifically whether he could appreciate the wrongfulness

of the alleged conduct or whether he was capable of forming the requisite intent." (ROA I at 100.)

Dr. Crago spent two days evaluating Petitioner. (Dkt. 63, Ex. PP at 1.) In contrast to his discussion with the other three psychologists, Petitioner told Dr. Crago that he "enjoyed hallucinating," and had abused marijuana, "mushrooms and acid," amphetamines, downers, cocaine, and alcohol. (*Id.* at 2.) Petitioner also said that, in addition to drinking alcohol, he had shot "two riggs" of cocaine intravenously on the day of the murder. (*Id.* at 1.) Diagnosing Petitioner with Substance Abuse, currently in remission, Dr. Crago concluded that Petitioner historically functioned as a drug addict, who most frequently abused alcohol, cocaine, and LSD. (*Id.* at 5.)

Based on standardized testing, Dr. Crago found Petitioner's intelligence to be "in the average range" and his cognitive functioning affected only by educational deficits, not any significant anxiety, pathological thought patterns, or residual brain damage. (*Id.* at 3.) In terms of personality functioning, however, Dr. Crago determined that Petitioner was "quite immature" and "moderately to severely disturbed." (*Id.*) "Although not floridly or overtly psychotic or schizophrenic, his thinking and reality testing showed definite evidence of a thought disorder including hallucinations and paranoid trends. He might best be characterized as a functioning or borderline schizophrenic." (*Id.* at 4.) Dr. Crago concluded that Petitioner presented as suffering from Mixed Personality Disorder, with schizotypal, borderline, paranoid, antisocial and avoidant features." (*Id.* at 5.) On the basis of his immaturity and thought disorder, Dr. Crago further opined that Petitioner was "quite reactive to his environment," a condition which might manifest itself in "releasing aggressive or hostile impulses." (*Id.* at 4.) According to Dr. Crago, the expression of anger in persons with Petitioner's personality profile "tends to come in acute outbursts and it may involve dangerously assaultive behavior." (*Id.*)

With regard to the offense, Petitioner denied murdering the victim, but admitted

1    entering the house to commit burglary.  Petitioner denied knowing the house was occupied

2    and indicated that he became afraid and left "when he felt a cold hand grasp his wrist and

3    saw something white which he felt was a 'ghost.'"  (*Id.* at 1.)  Because Petitioner denied

4    participating in the murder, Dr. Crago determined it was "impossible to accurately assess his

5    sanity" and "whether he knew right from wrong" at the time of the crime.  (*Id.* at 5-6.)  Dr.

6    Crago concluded, however, that if Petitioner had in fact committed the murder, "it is highly

7    possible" "he was insane or irrational at the time" because "extreme alcohol intoxication and

8    especially cocaine intoxication often precipitate psychotic behavior even in individuals who

9    are much less disturbed" than Petitioner.  (*Id.* at 6.)

10                    *Defense Theory*

11        The physical evidence undisputedly established Petitioner's presence inside the

12    bedroom.  Thus, to attack the prosecution's charge that Petitioner was "actively and

13    intimately involved in" the murder, the defense aimed to establish that Petitioner left the

14    house before Davis killed the victim (the "nonparticipation theory").  Counsel sought to

15    prove that Petitioner entered the house out of curiosity and under the mistaken belief that it

16    was vacant, but terminated his involvement by fleeing the premises minutes after he entered

17    and realized his error.  (RT 12/3/87 at 158, 166; RT 3/9/90 at 124.)  The layout of the

18    bedroom allowed counsel to conceptually divide the room into two sides:  the "bed side" of

19    the room, where the victim was beaten and strangled and evidence implicating only Davis

20    was found, and the other side of the room, where evidence implicating Petitioner was found.

21    (RT 3/9/90 at 125.)  The defense claimed that this layout confirmed Petitioner's absence

22    during the murder because "[t]here is not one piece of evidence, there's no shoe print, there's

23    no fingerprint indicating that Ben Salazar ever was on . . . the bed side of the room, where

24    it's clear this murder took place."  (RT 12/3/87 at 171.)  The defense also posited that the

25    cramped space in which the murder occurred did not allow for the possibility that more than

26    one person killed the victim.  (*Id.* at 170-71; RT 12/9/87 at 78-79.)

27

28                                  - 11 -

1    A key component of the defense theory was Petitioner's level of intoxication at the

2    time of the crime, which counsel relied on to establish "his state of mind as far as entering

3    the house."[9]   (RT 3/9/90 at 126.)   As a result of his intoxication, the defense argued,

4    Petitioner made several "less-than-wise" decisions, including entering the house based on

5    Davis's representation that it was vacant.   (RT 12/3/87 at 160-62, 166.)  However, because

6    he had vividly recounted many specific facts about the murder night to Drs. Gurland, LaWall,

7    and Crago, the defense did not suggest that Petitioner was so intoxicated he could not

8    remember critical details about the crime, such as why he entered the house ("on a whim,"

9    not to commit burglary), why he fled (he saw the occupant), the condition of the home

10   ("dusty, full of junk and completely silent"), why he thought the home was vacant (Davis

11   said so), and who killed the victim (Davis, after Petitioner left).  (Dkt. 63, Exs. VV, WW.)

12   During opening statements, defense counsel admitted that Petitioner's palm prints

13   were found on file cabinets in the victim's bedroom and promised to provide details about

14   the prints at trial.  (RT 12/3/87 at 165.)  In addition, counsel directly confronted both the

15   "bloody" palm print and the shoe print evidence implicating Petitioner:

16          *Now, the State's evidence in this case comes down to really two pieces*
       *of evidence.  One deals with a fingerprint or a palm print of [Salazar] that is*
17     *found back here on this file.  And you'll see it.*

18          *I think the file cabinet's going to be in here and it's in a reddish tint, or*
       *something like that.*  And the State's going to argue to you that that's proof that
19     Ben Salazar was there and did this horrible crime.

20          Well, whenever you hear anybody talk about that from this witness
       stand, and you will, there's talk and there's evidence.  And as everybody
21     always says, talk is pretty cheap.

22          This is a first-degree-murder trial.

23   _____

24          [9]    James Teran testified that Petitioner and Davis were "drinking heavily" the
     night of the murder.  However, Teran was "already drunk" when he saw them and thus did
25   not know whether Petitioner appeared to be intoxicated.  (RT 12/10/87 at 59-75.)  Petitioner
     testified that he and Davis consumed a half gallon each of tequila and gin shortly before the
26   crime, which made him "pretty drunk." (*Id.* at 106-10.)  Petitioner did not testify that he had
     also injected cocaine.

27

28

1
2
3

And we have [shoe]prints of Ben Salazar found out here at the point of entry, found just inside the point of entry, and the last one is found down around in this neighborhood on this tray [table].  And there are like two of them there.

4
5

Crucial – well, the State's position on this thing will be that next to Ms. Kaplan's arm is one of these prints, right next to the arm.  And there is some dust also on her arm.

6
7

And it will be the speculation of the State's witnesses that that indicates clearly that Mr. Salazar stepped on the tray [table] at the same time as her arm on his way out of the house.  Therefore, he was there.  Therefore, he's guilty.

8

You're going to have to pay real close attention to this dust and print evidence.

9
10

The evidence will be just as likely that the print was put down, that she was laid on this table, and that her arm got onto the dust, and that's the explanation for the dust.

11
12

But the State is going to try to indicate that that clearly proves that Ben was in there when she was on this table. And that's just not what the proof will be.

13

Again, talk is cheap.  We're talking about evidence.

14
15

Crucial in this regard is another [shoe] print found on this table top. And where is it found?

16
17

It's found directly under Ms. Kaplan's body.  There's no possible way the evidence will show that that print could have been put there after she was put there.  They would have to step right through the body.

18

So, what that shows is that this tray – this table top was down around the ground and, yeah, he stood on it and stepped on it, but not when she was there.

19
20

And that really, folks, is the case against Ben Salazar:  two pieces of evidence.  And it really is going to boil down to that.

21

(RT 12/3/87 at 167-69 (emphasis added).)

22      To support its theory that Davis committed the murder, the defense emphasized

23  evidence implicating Davis that was found on the bed side of the room:  (1) blood spatter

24  showing that the victim was beaten on, and strangled near, the bed; (2) Davis's shoe prints

25  in dirt at the foot of the bed and in blood on top of the bed; and (3) Davis's palm print on the

26  filing cabinet nearest the bed in a position suggesting that he used it to balance while

27

28                                    - 13 -

1    stepping over the body.  Counsel emphasized that no evidence showed Petitioner was ever

2    on the bed side of the room where the murder occurred.  (RT 12/3/87 at 170-72.)

3         The prosecution's case against Petitioner was strong, but not airtight.  Petitioner's

4    palm print was found in the bedroom in a red substance, but there were no eyewitnesses to

5    the crime and the State never tested the red substance in which the palm print was made.  The

6    prosecution did not know whose shoe prints were on the bed but blamed Petitioner for this

7    deficiency in the evidence because he and Davis disposed of their shoes after the crime.

8    Davis's aunt saw scratches on Petitioner's chest shortly after the murder, but the victim's

9    fingernails were not tested and Davis's aunt had a strong motive to lie.  While Petitioner

10   initially lied to the police, he subsequently provided a plausible explanation for his failure

11   to admit that he had entered the victim's home.

12        Petitioner's trial testimony countered the prosecution's theory.  Petitioner informed

13   the jury that he (1) entered the house not intending to commit burglary or murder but because

14   Davis told him the house was vacant and Petitioner was very intoxicated; (2) fled the house

15   as soon as he realized it was occupied; (3) left a palm print in his own blood because he had

16   cut his hands, most likely at work or that night while he was intoxicated; (4) disposed of his

17   shoes immediately after leaving because he knew his shoe prints were outside the house and

18   he "didn't want nothing to do with it" and (5) initially lied to the police because he was

19   scared, did not want to say anything that "would look bad," and wanted to talk to an attorney

20   before being interrogated.  (RT 12/10/87 at 124, 131.)

21        Davis did not testify at his separate trial.  Davis's defense team theorized that

22   Petitioner and Davis entered the house to commit burglary and that Petitioner alone later

23   returned to kill the victim so she could not identify him.[10]  (Davis RT 9/17/87 at 22-31.)  If

24   _____

25        [10]    In opening statements, Davis's attorney promised testimony from Davis and
26   others that Petitioner admitted killing the victim.  (Davis RT 9/17/87 at 31; Davis RT 9/22/87
     at 2-11.)  When the defense rested without putting on any evidence, counsel told the court
27   that their strategy had changed and Davis elected instead to rest on the "evidence dealing

28                                          - 14 -

the police had not conducted a "sloppy investigation," Davis argued, they would have determined that Petitioner alone killed the victim.

*Serology Report*

The serology report became an issue the second day of trial when identification technician Mike Sweedo testified about several reddish stains found on a filing cabinet in the bedroom, including one stain in which Petitioner's palm print was made. (RT 12/4/87 at 99-101, 104, 111, 114-16.)  Although a pretrial ruling prevented Sweedo from referring to the substance containing Petitioner's palm print as "blood," he described it as "a maroon-type red" liquid that was on Petitioner's "hand prior to being placed upon the [file] drawer." (*Id.* at 99-111; RT 12/7/87 at 33-37.)

After Sweedo testified, the prosecution announced its intent to call criminalist Victoria Bode to provide the serology report's conclusion that red stains on the filing cabinet near Petitioner's red-colored palm print were human blood matching the victim's blood type. (RT 12/7/87 at 116-17, 121-23.)  Hurd objected to Bode's testimony on the grounds that the defense was never provided the serology report, the results of which contradicted the defense's opening statement:

> I have never seen any reports by that woman.  I have proceeded along up until this very moment of this trial that no one has ever tested those [smears] to determine whether or not they're blood; and if so, whose?
>
> [The prosecution is] well aware of that fact.  We went into that at length a week ago.  I have made opening argument saying that's not the case.

(*Id.* at 117-18, 127-28.)[11]  As a result of this objection, the court permitted defense counsel to interview Bode and obtain their own expert to test the smears.  (RT 12/4/87 at 132-33, 140; RT 12/7/87 at 14-20.)

---

with the physical aspects of the interior of the residence."  (Davis RT 9/22/87 at 3.)

[11]     The defense later determined that they had received the serology report on July 13, 1987, but apparently overlooked it before trial. (RT 12/7/87 at 3-4; RT 3/9/90 at 121-23.)

At a subsequent *Frye* hearing, the defense expert testified that Bode's method for typing the blood did not comply with accepted scientific standards. (RT 12/9/87 at 156-218.) Based on the defense expert's testimony, the prosecution agreed not to admit any evidence of blood typing. (*Id.* at 188-89; RT 12/10/87 at 9-11, 35-37.) Bode then testified that red stains on the file cabinet were human blood, but did not tie the blood to the victim or Petitioner. Bode never testified that Petitioner's red palm print was made in blood. Instead, she admitted on cross-examination that his red palm print could have been tested but was not. (RT 12/10/87 at 33-40.)

Petitioner testified that any blood on his shirt or on the file cabinets was "probably [his] blood," because he worked with scrap metal and frequently cut his hands. (*Id.* at 132.) Because he was "drunk" on the night of the murder, Petitioner did not remember cutting his hands; however, he did recall having cuts on his hands the next morning. (*Id.* at 132-33.) Petitioner also admitted holding onto file cabinets when guiding himself through the house. (*Id.* at 117-18, 132-33.)

2.    Presentencing Proceedings

One month following Petitioner's conviction, the court held an aggravation/mitigation hearing. In a pre-hearing brief, the prosecution argued that two aggravating factors required imposition of the death penalty: Petitioner committed the murder with the expectation of pecuniary gain, A.R.S. § 13-703(F)(2), and in an especially cruel, heinous, or depraved manner, A.R.S. § 13-703(F)(6). (ROA I at 382-92.) In support of the first factor, the prosecution cited witness testimony from a pretrial hearing in co-defendant Davis's case and evidence from Petitioner's trial indicating that the victim's home had been searched. (RT at 386-87.) For the second factor, the prosecution asserted that the victim's murder was brutal and senseless, that she was helpless, and that the perpetrators exerted gratuitous violence. (*Id.* at 388-89.)

Defense counsel also submitted a pre-hearing brief. (*Id.* at 352-69.) Consistent with

- 16 -

the defense's guilt-phase theory, the memorandum asserted that Petitioner did not participate and was not present when Davis killed the victim.  (*Id.* at 354-56.)  Petitioner entered the victim's home only because he was extremely intoxicated and believed it was unoccupied.  (*Id.* at 353.)  The court should not impose the death penalty, the defense argued, because it could not be sure Petitioner participated in the killing, the jury likely found him guilty under the felony murder rule, and the State failed to prove beyond a reasonable doubt that Petitioner killed, attempted to kill, or intended to kill the victim.  (*Id.* at 356-57.)  Finally, the memorandum urged the court to consider a number of mitigating factors: (1) Petitioner was intoxicated from alcohol at the time of the crime and thus his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law's requirements was significantly impaired; (2) Petitioner's role in the killing was "relatively minor"; (3) Petitioner could not have reasonably foreseen that his conduct would create a grave risk of death because he believed the house was unoccupied and he and Davis never discussed what they would do if inhabitants were encountered; and (4) Petitioner's young age – twenty-two at the time of the crime – and lack of prior felony convictions (*id.* at 366-68).  *See* A.R.S. §§ 13-703(G)(1), (3), (4) & (5).

    To buttress the nonparticipation mitigation theory at the presentencing hearing, defense counsel elicited testimony from Petitioner's parents and brother that Petitioner was neither violent nor aggressive.  Petitioner's parents testified that Petitioner never got into fights at school or home, did not have a violent temper, and was well regarded by neighbors and employers.  (RT 1/14/88 at 6-9, 12-15.)  In response to the judge's questioning, Mrs. Salazar acknowledged that Petitioner used marijuana and drank alcohol, but said she was unaware of him using any other types of drugs or drinking "hard liquor."  (*Id.* at 20-21.)  She further testified that she had never seen Petitioner change personalities or become aggressive when intoxicated.  (*Id.* at 21.)

    Petitioner's younger brother, Mauricio, testified that Petitioner got into a lot of fights

at school, but most were in defense of Mauricio. (*Id.* at 23.) He and Petitioner began drinking beer and smoking pot in the fifth or sixth grade. (*Id.* at 24.) In junior high, they started doing other types of drugs, including LSD, cocaine, speed, and mushrooms. (*Id.* at 25.) According to Mauricio, Petitioner drank and used drugs up to the time of the crime. (*Id.*) Although Mauricio admitted seeing Petitioner on occasion become violent and "explode" when drunk (*id.* at 30-31), he testified that most of the time Petitioner was "really quiet," "withdrawn," and "would just keep to himself" when intoxicated (*id.* at 26, 31).

### 3. Presentencing Report

Prior to sentencing, the trial judge also received and considered a presentence report (PSR) prepared by the court's probation department. *See* A.R.S. § 13-703(C) (1978) (repealed by Laws 1999, Ch. 104, § 1). The PSR provided the following social history:

> The defendant was one of three offspring born to Mauricio and Darlene Salazar. Mr. Salazar also reared five stepchildren which were the result of his wife's first marriage. Mr. Salazar was employed for Hughes Aircraft and was able to provide his family with a lower middle class socioeconomic environment. The defendant related that he developed close emotional ties to his parents and siblings. While his juvenile record mentioned that his mother tended to be overprotective, there is no mention of a dysfunctional family environment. In general, the defendant experienced an uneventful and healthy childhood.

(PSR at 4.)[12] Petitioner was a poor student, who had to repeat the third and eighth grades. (*Id.* at 5.) "The defendant described himself as 'a mellow person' but confirmed that he had a reputation of being an aggressive fighter in high school." (*Id.*) Petitioner admitted being an alcohol and drug abuser, but claimed to be in sound physical health and denied any psychological difficulties. (*Id.*) "He expressed himself in a calm manner and articulated very well, especially considering his limited education." (*Id.*)

Petitioner's criminal record included several charges as a juvenile, including throwing

---

[12] The original presentence report and all attachments thereto were provided to this Court as part of the state court record. *See supra* note 3.

- 18 -

rocks at a bus, running away from home, fighting with police officers, and stealing a purse.[13]
(*Id.* at 3.)  Following the purse-snatching incident at age fifteen, he was evaluated by a court-appointed psychologist in preparation for sentencing, and this report was included in the PSR for the instant offense.  (Dkt. 63, Ex. OO.)  Dr. Cynthia Ginnetti found symptoms of depression resulting from Petitioner's grief at the death of an older brother (who was stabbed in a barroom brawl) and the termination of relationships with a close friend and a girlfriend. However, she found "no formal thought disorder" and recommended that Petitioner seek outpatient mental health treatment for grief and anger.  (*Id.* at 2-3.)  At the time, Petitioner reported getting along well with his mother but having a strained and distant relationship with his father, who he believed unfairly favored Petitioner's younger brothers.  (*Id.* at 2.)

In late 1984, at age twenty-one, Petitioner was arrested for disorderly conduct for fighting with nightclub bouncers.  The police report of that incident states that Petitioner was "extremely intoxicated and was seen by a bouncer punching a customer; he was asked to leave.  He became combative and had to be subdued by several bouncers."  (PSR, Attach. (Rpt. No. 8411140403).)  The bar management requested that Petitioner be prosecuted "due to past problems" with him. (*Id.*)

The PSR concluded:

> The defendant's involvement in the instant offense is difficult to analyze.  Although he does not perceive his family background as dysfunctional, there is considerable evidence that contradicts his perception. He has maintained a pattern of abusing drugs and alcohol since his mid-teen years.  Additionally, there are certain incidents, documented in the criminal record section of this report, which reveal the presence of an aggressive personality.  His involvement in the instant offense appears to have been an extreme situation, probably facilitated by his severe intoxicated state and the presence of an accomplice.

> The defendant has failed to demonstrate any remorse toward the victim and her family, and appears to be concerned only about his fate.  His recent

---

[13]     The PSR also listed residential burglary and auto theft as part of Petitioner's record, but counsel asserted during presentencing arguments, without dispute from the State, that this was an error.  (RT 2/8/88 at 18-19.)

commitment to religion seems questionable and may be a ploy to present himself in favorable terms.  Based on the defendant's lack of remorse and his chronic substance abuse problem, his rehabilitation potential appears to be poor.

(PSR at 6.)

Appended to the PSR  were fifteen letters of support from friends, family, and former co-workers. Many of the letters characterized Petitioner as a non-violent person who stayed out of trouble; all described him as a loving person who helped others.  (PSR, Attachs. (packet of handwritten letters).)  Petitioner also submitted a letter.  It stated, in pertinent part, that he began using marijuana in the fifth grade and LSD and cocaine in the seventh grade, his "school days weren't very violent" as he was only in two fights in school and "one after that," he was an "alcoholic" and was using a lot of LSD by the eighth grade, and he would not be "in this mess" if he had not have been "drinking so much liquor that night."  (*Id.*) With respect to the murder, Petitioner wrote that "[i]t never crossed my mind to still [sic] or hurt anyone and I did'ent [sic]"; that he told the truth on the stand and had no reason to lie; and that, "I do not see why I have to be put to death, or spend the rest of my life in prison for something I did not do."  (*Id.*)

Finally, the PSR included a report from psychologist Catherine Boyer, who at the court's request conducted a general evaluation of Petitioner following his conviction. (ROA I at 372.)  Other than depression, Dr. Boyer found that Petitioner presented "no indication of any other major mental disorder." (Dkt. 63, Ex. TT at 5.) She concluded that chronic and severe substance abuse had been the primary problem throughout Petitioner's life and diagnosed him as in remission from "Alcohol Dependence" and "Drug Abuse (LSD, marijuana, cocaine)." (*Id.*)  In conversations with Dr. Boyer, Petitioner maintained his innocence.  He admitted consuming a large quantity of alcohol before entering the victim's home, but denied being present at the time of the murder. (*Id.* at 2.)  Dr. Boyer was unable to determine "[t]he extent to which drug or alcohol intoxication may alter [Petitioner's] behavior," but found "some indication that at least in times in the past, he has been

1    aggressive while intoxicated." (*Id.* at 5.)

2        4.    Sentencing

3        Sentencing took place on February 8, 1988, several weeks after the mitigation hearing.

4    Defense counsel Hurd argued against the State's asserted aggravating factors and reminded

5    the court that, in addition to being a mitigating factor, the felony murder rule prevented the

6    court from imposing the death penalty absent a finding beyond a reasonable doubt that

7    Petitioner killed, attempted to kill, or intended to kill the victim. (RT 2/8/88 at 12-13.) In

8    support of its theory that Davis committed the murder, the defense emphasized the following

9    points: (1) Petitioner had been drinking heavily and was very intoxicated when he entered

10   the house, (2) Petitioner did not know the victim and believed the house was unoccupied, and

11   (3) none of the physical evidence implicating Petitioner was found near the bed side of the

12   room by the victim's body. (*Id.* at 8-12.) Counsel also reurged the mitigating factors

13   identified in the presentencing brief: (1) due to his highly intoxicated state, Petitioner lacked

14   the capacity to appreciate the wrongfulness of his conduct; (2) he was a minor participant in

15   the killing; (3) he entered the house believing it to be uninhabited and thus could not have

16   reasonably foreseen that a death would occur; (4) his young age; and (5) his lack of

17   significant criminal record. (*Id.* at 17-18.) In closing, the defense cited Dr. Boyer's report,

18   which described Petitioner as "the type of person who, when confronted with the difficulties

19   of life, retreats. You know, it's a fight-or-flight-type syndrome. His response is flight." (*Id.*

20   at 19.) Based on Petitioner's trial testimony, counsel contended, "that's what he did in this

21   case, Judge." (*Id.*)

22       Petitioner also addressed the court before sentencing: "Your Honor, I'd like to say

23   I feel really bad about what happened that night. I had no idea that would happen. I didn't

24   kill that poor lady. I pray for her and her family every night. Your Honor, I'd ask you not

25   to give me the death penalty." (*Id.* at 20.)

26       Following the arguments of counsel, the court entered its findings. With regard to the

27

28                        - 21 -

"especially cruel, heinous or depraved" aggravating factor, the court found that A.R.S. § 13-703(F)(6) was proven beyond a reasonable doubt based on "the excessive amount of gratuitous violence on the victim, the senselessness of the murder and the helplessness of the victim." (*Id.* at 36.)  Specifically, the court determined that:

> the Defendant and Mr. Davis went to the house in the middle of the night where they knew a fragile, elderly woman lived; that they removed the wrought iron on the window that had been placed there for her protection; that at the time that this was occurring, the television was on.
>
> So, the Court determines that there is no doubt that the men knew that the residence was occupied at that point.
>
> The Defendant then went to a relatively secluded part of the residence where she slept.
>
> The Court further finds that the position of the bedroom or sleeping area was such that you could not just accidentally run into her because it was in a relatively secluded portion of the house with only one way to get there.
>
> The Court finds that this was not an accidental interaction with the victim.
>
> The Court further notes that there was a large number of file cabinets and other storage places in the house.
>
> The footprints of two different individuals that were found somewhere on her were – were on her body.  Some footprints were on the top of the table wherein the body was found and the footprints were left by different type shoes.
>
> There were a number of file drawers opened and there were numerous and varied areas where valuables, if she had any, could have been hidden.
>
> The Court further notes that there were a number of injuries to Ms. Kaplan implying a number of blows to her face and body, including a blow to her forehead, one behind her ear, one to her mouth, one under the chin, and a blow to her shoulder.
>
> She was a frail person weighing approximately eighty-nine pounds, and was approximately eighty-three years of age.
>
> She was strangled with a telephone cord after the beating, and the telephone cord was looped twice around her neck with great force.
>
> Fingerprints or palm prints of the Defendant Davis and the fingerprints of the Defendant Salazar in what appeared to be blood were found immediately adjacent to where the strangled body was located.

1

2

3

Of the two different kinds of footprints that were found on the table where the body lay, one set was on her body.  The other footprint was left on the table where she had been stepped on, and there was an imprint on the arm and the table.

4

The Court further notes that in addition to Mr. Salazar's fingerprints that was left in what appeared to be blood, there were scratches on his chest.

5

6

Either cruelness of mind or depravity was exhibited by the placement of the telephone back on the receiver while the cord was entwined around Ms. Kaplan's throat.

7

8

9

The Court finds that the forensic evidence indicates that this was a planned, calculated attempt to go to her bedroom.  And I believe what occurred afterwards was an attempt to extract, if possible, information of where imagined valuables were hidden.  That explains in this Court's view the number of blows and injuries she suffered before she was strangled.

10   (*Id.* at 34-36.)  The Court did not address, or make any findings regarding, the "pecuniary

11   gain" aggravating factor alleged by the State.

12         Regarding mitigation, the court found that Petitioner had failed to establish any of the

13   statutory factors set forth in A.R.S. § 13-703(G).   (*Id.* at 36-37.)   With regard to the

14   "relatively minor" participant factor in particular, *see* A.R.S. § 13-703(G)(3), the court

15   expressly found that Petitioner had failed to establish by a preponderance of the evidence that

16   he was not present at the time of the murder.   "The facts and circumstances of how the entry

17   was made, where the bedroom was, and the footprints and fingerprints of both Defendants

18   instead show beyond reasonable doubt that both were present when Ms. Kaplan was

19   murdered."  (*Id.*)  Addressing non-statutory mitigation, the court found that Petitioner had

20   proven the following factors:  (1) lack of a prior felony conviction, (2) "the fact that alcohol

21   and perhaps other substances were used prior to the break-in," (3) the fact that the jury was

22   instructed on felony-murder, and (4) the question of whether Petitioner engaged in the actual

23   strangulation.  (*Id.* at 37-38.)  As to the third and fourth factors, the court further found that

24   Petitioner "was a major participant in the felony committed, and that his involvement led to

25   either the actual participation in the strangulation or the other violence perpetrated on the

26   victim, or indicated reckless indifference to human life by the Defendant's actions, when in

27

28                                                    - 23 -

his presence the victim was being murdered." (*Id.*)  Under these circumstances, the court concluded, Petitioner's proven mitigating factors were not sufficiently substantial to call for leniency.  (*Id.* at 39.)

On direct appeal, the Arizona Supreme Court upheld the trial court's findings with respect to the "cruel, heinous or depraved" aggravating factor and Petitioner's death eligibility under *Tison v. Arizona*, 481 U.S. 137 (1987) (holding that death penalty may be imposed if a defendant convicted a felony murder was a major participant in the underlying felony and acted with reckless indifference to human life).  *Salazar*, 173 Ariz. at 412, 844 P.2d at 579.  As to mitigation, the court discussed each of Petitioner's proffered factors.

Regarding intoxication, the court found that Petitioner was not significantly impaired and appreciated the wrongfulness of his conduct because two witnesses testified at trial that Petitioner did not appear intoxicated; Petitioner testified in detail about what went on in the house, including in which hand he held a lighter to guide himself; and Petitioner "was thinking clearly enough to discard his shoes so that they could not be matched to the prints he knew he had made at the house." *Id.* at 413, 844 P.2d at 580.  The court further rejected Petitioner's "attempt to downplay his degree of participation in the crime," reiterating that he was a major participant.  *Id.*  Similarly, the court rejected Petitioner's claim that he believed the house was unoccupied and therefore could not foresee the victim's death: "After entering the occupied house, defendant either personally beat and strangled the victim or, at the very least, watched or helped while Davis killed her." *Id.* at 414, 844 P.2d at 581.  Lastly, the court found that Petitioner's young age was not mitigating in light of his average intelligence, history of juvenile and adult misdemeanor offenses, and his "close and supportive family." *Id.*

5.    State PCR Proceedings

In his first state PCR petition, Petitioner argued that defense counsel Hurd and Redondo provided constitutionally deficient representation at sentencing for (1) failing to

object to the trial court's consideration at sentencing of evidence produced during co-defendant Davis's trial, (2) not presenting evidence at the mitigation hearing regarding the effects of poly-substance abuse and Petitioner's state of mind, and (3) calling a detrimental witness at the mitigation hearing. (ROA II at 273-74, 278.) In support of the petition, PCR counsel proffered an affidavit from Petitioner, which claimed that trial counsel consulted with him only on a limited basis, that he knew of witnesses who could and should have been utilized at sentencing to testify to his character, and that he was extremely intoxicated at the time of the crime and had a long history of alcohol abuse but counsel failed to present expert testimony in this regard at sentencing. (*Id.* at 339.) Counsel also submitted an affidavit from Dr. Crago, who was uncertain why he was not called as a witness. (*Id.* at 441.) Dr. Crago avowed that Petitioner "could easily become psychotic" under stress and drug intoxication. (*Id.*)

*PCR Evidentiary Hearing*

The trial court conducted a two-day evidentiary hearing on Petitioner's IAC claims. Petitioner called Dr. Crago, PCR investigator Ron Sanchez, and trial counsel Hurd as witnesses. He also proffered an investigative report prepared by Sanchez that included Petitioner's available school records and summaries of interviews between Sanchez and several of Petitioner's friends and family members. The State submitted the pretrial Rule 11 reports of Drs. Gurland and LaWall and presented the testimony of Dr. Boyer.

Dr. Robert Crago

Dr. Crago testified regarding his "Mixed Personality Disorder" diagnosis of Petitioner. (RT 3/9/90 at 8-9.) He stated that this diagnosis was made in lieu of borderline schizophrenia, a former diagnostic category in a prior edition of the DSM that refers to someone "who has evidence of a thought disorder but usually . . . is functioning without it

being apparent" and, in Petitioner's case, is "fairly disturbed."[14]  (*Id.*)  Given Petitioner's personality profile, Dr. Crago speculated that if Petitioner "truly was under the influence of substances such as alcohol or cocaine [at the time of the crime] one would predict that he would be capable of violence and would not have control of his judgment or his behavior at that time."  (*Id.* at 13-14.)  He further stated that this opinion would have been bolstered by the testimony of lay witnesses who claim Petitioner has no memory of past violent incidents that occurred while he was intoxicated.  (*Id.* at 14, 88.)

Dr. Crago initially testified that Petitioner "either had no memory or denied that he did the crime."  (*Id.* at 13.)  However, he admitted on cross-examination that Petitioner denied strangling the victim, thus effectively retracting his direct testimony that Petitioner had no memory of the offense.  (*Id.* at 32-33.)  During an alcoholic blackout, there is either "a total blank in memory" or "partial or little memory of the event or distorted memories."  (*Id.* at 91-92.)  Dr. Crago identified two conditions that could have put Petitioner into a psychotic state, or "blackout," such that he could have not remembered committing murder: extreme intoxication from alcohol or cocaine or extreme emotional anxiety or anger.  (*Id.* at 82-85.)  Dr. Crago did not know whether Petitioner was extremely intoxicated or angry at the time of the crime, and thus could not assess his sanity at that time.  (*Id.* at 84-85.)  He acknowledged, however, that it would not be consistent with an alcoholic blackout for Petitioner to be able to testify to a detailed recollection of everything he did that night, such as leaving a party, entering the victim's house, flicking a lighter, and smelling dust.  (*Id.* at 92.)

Ron Sanchez

Ron Sanchez, an investigator for PCR counsel, interviewed eleven individuals concerning Petitioner's background. (Dkt. 138, Ex. 2.) Of these eleven, three had previously

---

[14]     "DSM" refers to the *Diagnostic and Statistical Manual of Mental Disorders*. At the time of his evaluation of Petitioner, Dr. Crago utilized the third edition of the DSM.

1   been contacted by either counsel Hurd or the defense investigator (Petitioner's parents and

2   Tony Moreno) and three had sent presentencing letters to the trial judge in support of

3   Petitioner (Lillian Burns, Alfredo Castaneda, and Patricia Castaneda).   His report

4   summarizing each of the interviews was admitted during the PCR hearing.  (*Id.*)

5       Burns, who along with her husband, had lived across the street from the Salazars for

6   many years, described Petitioner as "very polite and well-behaved."  (*Id.* at 9.)  She had no

7   knowledge of any substance abuse or violent propensities.  In their letter to the trial judge

8   prior to sentencing, the Burnses stated that Petitioner was a "quiet, caring person," who they

9   knew in their "hearts" had taken no part in the murder. (PSR Attach.)  The Castanedas, also

10  neighbors, recalled Petitioner as patient and kind and had no knowledge of any substance

11  abuse or violent propensities. (Dkt. 138, Ex. 2 at 10.) Their separate letters to the trial judge

12  similarly extolled Petitioner's virtues.  (PSR Attach.)

13      Petitioner's parents told Sanchez that Hurd never returned any of their telephone calls

14  regarding Petitioner's representation and "the investigator (identity unknown)" only spoke

15  to them for "two to three minutes." (*Id.* at 2.) Consistent with their penalty phase testimony,

16  the Salazars admitted Petitioner consumed alcohol.  Inconsistent with their testimony,

17  however, the Salazars stated they were aware Petitioner used drugs and "on occasion" got

18  into fights at school. (*Id.*)

19      Long-time friend Tony Moreno described Petitioner as "quiet and helpful" when

20  sober, but "aggressive and somewhat violent when under the influence of drugs and/or

21  alcohol." (*Id.* at 4.) He described one incident in which Petitioner repeatedly beat his

22  brother Mauricio's head against a concrete porch, resulting in hospitalization and surgery on

23  Mauricio's jaw. (*Id.*) Another time, Petitioner, drunk at a party, got angry at a friend and

24  choked him with significant pressure until a bystander physically removed him. (*Id.* at 5.)

25      Debbie Green described Petitioner as polite when sober but abusive, violent, and

26  aggressive when intoxicated. (*Id.* at 3.) She claimed that Petitioner once pinned her to the

27

28                                           - 27 -

1  ground, applying a great deal of pressure and causing her pain. (*Id.*)  She also described an

2  incident when Petitioner was "very drunk," picked up a cat by its tail, repeatedly slammed

3  it against a shed wall, and threw it away after it died.  (*Id.*)  Dawn Pruett, a former girlfriend

4  of Petitioner's brother Mauricio, stated that Petitioner became aggressive when drunk and

5  once choked her for a short period of time.  (*Id.* at 11.)  Manual and Raymond Ochoa also

6  relayed instances of violence by Petitioner when intoxicated.  (*Id.* at 6-7.)

7                              Patrick Hurd

8       Hurd graduated from law school in 1984 and immediately began working for the Law

9  Offices of William Redondo.  (RT 3/9/90 at 102.)  At the time of trial, Hurd had "first-

10 chaired" ten or fifteen jury trials, eight or nine of which involved "virtually the gamut of

11 felonies short of a first-degree murder case," including burglaries, robberies, sexual assault,

12 child molestation.  (*Id.* at 103-04.)  He had second-chaired two or three homicide cases with

13 Redondo, none of which were capital cases, and worked on various aspects of about sixty

14 felony cases.  (*Id.* at 143-44, 158.)

15      Hurd served as the lead attorney in Petitioner's case and was primarily responsible for

16 preparing and investigating the case, including witness interviews.  Redondo acted in a

17 "supervisory capacity" and was present at most of the witness interviews and throughout the

18 trial. (*Id.* at 105, 155.)  Among other things, Redondo gave the closing argument at the guilt

19 phase.  Redondo and Hurd "conferred constantly" throughout the trial.  (*Id.* at 155.)

20      Counsel knew that Petitioner had consumed a large quantity of alcohol before the

21 crime and thus considered presenting an intoxication defense. (*Id.* at 125.) Before trial, Hurd

22 and Redondo ultimately decided not to raise an insanity or an intoxication defense to justify

23 Petitioner's actions in assaulting or killing the victim "because it was [their] position that he

24 didn't do it." (*Id.* at 126.) Although the defense introduced evidence that Petitioner had been

25 "drinking considerably" before the murder, such evidence was provided only to explain "his

26 state of mind as far as entering the house." (*Id.*)

27

28                              - 28 -

During the penalty phase, the defense "continued with the same strategy that [it] had throughout, and that was that [Petitioner] didn't do it." (*Id.* at 142.) Counsel determined that, in order to present an effective nonparticipation mitigation theory, Petitioner needed to be portrayed as a non-violent drinker:

> the picture we were trying to portray was that [Petitioner] did not become violent upon drinking, that he became quiet and to himself. And there was some evidence, I believe, to that effect.
>
> And evidence which portrayed the other picture, that, you know, he would become volatile or aggressive, that really wasn't the picture we were trying to paint at the time.

(*Id.* at 141; *see also id.* at 153.) In explaining why he did not utilize Dr. Crago at sentencing, Hurd explained:

> I guess the easiest way to answer that question is to tell you what my strategy was at sentencing.
> . . . .
>
> And, really, my strategy at sentencing wasn't much different from what it had been at trial. Our defense the whole time had been that Salazar did not do it, that though he may be guilty of felony murder or he may be guilty of murder because he hung around with Davis, Davis is the one that did it. And that strategy did not change when it came time for sentencing. At no point do I recall presenting any argument or evidence to the Court that, yes, Mr. Salazar did it, but the reason he did it is because of intoxication or for any other reason. I believe we pretty much stuck to our original defense and that is: If you don't know who did it, Judge, then you can't give this guy the death penalty; give it to the other guy.

(*Id.* at 137.) When asked whether he "consciously or actually remember[ed] Dr. Crago's report and decide[d] not to tell the Judge about" it, Hurd responded:

> I can't tell you whether it was a conscious decision on my part not to use it. I've had a chance to look at the report. There are some things in there that I don't know that I wanted the Court to know about, to be perfectly frank about it. But I can't tell you whether or not it was a conscious decision not to use it or if I just didn't use it.

(*Id.* at 137-38.) Hurd would not have wanted Judge Veliz to know Dr. Crago's conclusion that Petitioner was prone to dangerously assaultive behavior because "it wasn't consistent with the nonviolent nature of [Petitioner] that [the defense was] trying to portray." (*Id.* at 152-53.)

- 29 -

1     As to whether Petitioner became aggressive or withdrawn when he was intoxicated,

2     Hurd explained that the defense had "no conclusive evidence either way," but "the

3     impression that [the defense was] trying to make and the evidence from what [we] had to

4     work with was that, yes, [we] wanted to portray [Petitioner] as a mellow drunk and not an

5     aggressive, violent type of person when he is intoxicated." (*Id.* at 153.)   Counsel knew there

6     was evidence on both sides of the issue, but chose to present only witnesses who testified

7     consistently with the defense that Petitioner was not an aggressive, violent person when he

8     was intoxicated.  (*Id.* at 154.)   Thus, although they knew such evidence existed, counsel

9     made a strategic decision not to present "reports of [lay or expert] witnesses which, in fact,

10    included that kind of business about dangerously assaultive behavior."  (*Id.* at 152-54.)

11    Prior to the presentence hearing, Petitioner's brother Mauricio told Hurd he wanted

12    to help Petitioner and could testify that "when [Petitioner] became intoxicated he would

13    become mellow and introverted and like to keep to himself."  (*Id.* at 150; *see also id.* at 140.)

14    Hurd was surprised when Mauricio testified that he had seen Petitioner become violent when

15    intoxicated.  (*Id.* at 150.)  If Hurd had been aware of other witnesses in addition to Mauricio

16    who could have confirmed that Petitioner became aggressive when intoxicated, he may have

17    viewed the case differently.   He acknowledged that such evidence may have supported Dr.

18    Crago's opinion that Petitioner could have been "suffering from schizotypal, borderline,

19    paranoid antisocial and avoidant behavior" at the time of the crime.  (*Id.* at 158.)   However,

20    Hurd could not say whether this information would have changed his approach to the case

21    and was reluctant to vary from the defense's original strategy that Petitioner "didn't do it and

22    he's not the type of person that would do it, that Davis did it."  (*Id.* at 159-60.)   Hurd also

23    recognized that Petitioner testified in detail about the night of the murder and agreed there

24    were risks in presenting a client at a death sentencing "as a person who becomes aggressive

25    and assaultive and attempts to strike and strangle people."  (*Id.* at 160, 162.)

26    Regarding co-defendant Davis, Hurd knew that Davis had been sentenced to death

27

28                                          - 30 -

1   prior to Petitioner's presentence hearing but did not know what evidence had been presented

2   at Davis's presentence hearing.[15]   (*Id.* at 133.)   Hurd did not object when the prosecution

3   asked the court to consider at sentencing evidence admitted at Davis's trial and could not

4   "remember thinking about it one way or the other."   (*Id.*)

5          With respect to the letters appended to the presentence report, Hurd lacked specific

6   recollection of who wrote to the judge.   (*Id.* at 154.)   However, it was the Redondo firm's

7   standard procedure to "get in touch with family, friends, people from work and anybody else

8   who may know the defendant and is willing to write a favorable letter," and Hurd had no

9   reason to believe either he or the investigator failed to follow this procedure.   (*Id.* at 154-55.)

10                              Dr. Catherine Boyer

11         Dr. Boyer, who examined Petitioner prior to sentencing, clarified that she was asked

12  by the probation department to conduct a general psychological evaluation to assess

13  Petitioner's current mental state; her purpose was not to determine his mental state at the time

14  of the offense. (RT 4/13/90 at 17-18.)   Although Petitioner appeared to be "depressed," and

15  had "a number of emotional problems in large part which result from his longstanding

16  substance abuse," Dr. Boyer concluded that Petitioner "did not appear to suffer from any

17  major mental illness," including "the equivalent of schizophrenia, some kind of psychotic

18  level disorder, some kind of major affect[ive] illness like bipolar disorder also known as

19  manic depressive disorder." (*Id.* at 18-19.)   Although Dr. Boyer did not focus on Petitioner's

20  mental state at the time of the crime, neither her interview with Petitioner nor the collateral

21  information she reviewed raised any serious doubt about him not suffering from a psychotic

22  mental disorder.   (*Id.* at 20-21.)   She also found it significant that Petitioner had no prior

23  history of or treatment for a major mental illness.

24  ───────────────

25         [15]     Besides attending closing arguments and reviewing exhibits admitted in

26  Davis's case, Hurd was aware of the evidence presented during a pretrial hearing that
    included inculpatory statements supposedly made by Petitioner.  (RT 3/9/90 at 132, 151,

27  158.)

28                                  - 31 -

1    Dr. Boyer prepared her report after interviewing Petitioner at the jail and reviewing

2    raw data from tests administered by Dr. Crago.  Petitioner explained "his history of substance

3    abuse and what he had used over the years and the circumstances under which he used it."

4    (*Id.* at 48.)  Petitioner told Dr. Boyer that he was under the influence of rum and tequila at

5    the time of the crime, but did not mention taking cocaine or that being intoxicated "altered

6    his behavior in any bizarre or irrational kinds of ways."  (*Id.* at 50.)  Petitioner described

7    what he did the night of the crime, and the basics of his story were consistent with the

8    collateral information she received from the probation department.  (*Id.* at 14.)  Dr. Boyer

9    thought Petitioner "was being straightforward in everything he told" her, but she did not

10   know if he had told Dr. Crago the truth.  (*Id.* at 62.)

11   The results of an MMPI administered by Dr. Boyer did not show the extent of mental

12   problems reflected in the MMPI administered by Dr. Crago.[16]  (*Id.* at 31-32, 35-36.)  Dr.

13   Boyer looked at a number of critical items from Petitioner's MMPI results and "none of his

14   responses did seem to indicate that he had been psychotic," although some of his responses

15   indicated "quasi psychotic symptoms."  (*Id.* at 40.)  In Dr. Boyer's opinion, Petitioner's

16   scores on the MMPI more likely reflected that he was "alienated from other people," rather

17   than schizophrenic.  (*Id.* at 40-41.)

18   Dr. Boyer determined that Petitioner's intelligence scores were partly inconsistent

19   with Dr. Crago's conclusions.  Petitioner "had above-average scores on some of the subtests

20   of the IQ tests that reflect abstract reasoning and . . . problem solving."  (*Id.* at 41-42.)

21   According to Dr. Boyer, the subtests on which Petitioner scored above-average "are much

22   more likely to be the lowest in someone who has problems with a thought disorder.  And in

23   his case they were the highest," which was unexpected.  (*Id.*)  Thus, Dr. Boyer concluded

24

25   _____

26      [16]    Dr. Boyer explained that Petitioner's MMPI results most likely differed when
     she administered the test four months after Dr. Crago because he was probably under more

27   stress during the earlier test.  (RT 4/13/90 at 31-32, 35-36, 37.)

28   - 32 -

that the results of Petitioner's mental status examination "didn't reflect that he was psychotic at the time of the testing," and the IQ tests "were not consistent with psychosis." (*Id.* at 41.)

Dr. Boyer also reviewed raw test data from other tests Dr. Crago conducted. In Dr. Boyer's opinion, Dr. Crago's raw test data alone did not support his conclusion that Petitioner suffered from borderline schizophrenia. In fact, none of the information in Dr. Crago's report altered Dr. Boyer's conclusion that Petitioner did not suffer from any mental problem or defect. (*Id.* at 44-45.) Although there was nothing in the data Dr. Boyer reviewed that indicated Dr. Crago incorrectly administered the tests, she could not determine whether Dr. Crago's opinion was supported by sufficient data because she had no knowledge of his clinical interview with Petitioner. (*Id.* at 54-56.)

Dr. Boyer testified that receiving information from persons who had seen Petitioner become aggressive when intoxicated and have no memory of those episodes would have increased her understanding of Petitioner, but would not have invalidated her conclusions about his overall psychological functioning. (*Id.* at 50.) In order to determine whether Petitioner had a "major mental disorder such as schizophrenia," Dr. Boyer did not need more information than she was presented with at the time of her analysis. (*Id.* at 52.)

*State Court Rulings*

On January 11, 1991, the state court rejected Petitioner's IAC claims. Regarding counsel's failure to object to the court's consideration of evidence presented during co-defendant Davis's case, the court expressly stated that it "did not consciously use any evidence from the Davis case against Salazar." (ROA II at 223.) Regarding counsel's failure to present testimony from Dr. Crago, the court found that counsel had made a reasonable tactical decision not to present such testimony:

> The defense tactic was to attempt to portray Salazar as being withdrawn and quiet when intoxicated and then argue that although defendant Salazar was found guilty of felony murder, he had not actually committed the murder. Apparently, the defense believed that his argument would have been adversely impacted if Crago had testified that, in his opinion, Salazar was a deeply disturbed individual who could be adversely affected by the use of alcohol and

drugs.  The defense feared that this evidence could implicate Salazar as a perpetrator.  The Court finds that this tactical decision did not fall below objective standards of reasonable representation measured by prevailing professional norms.

(ROA II at 222-23.)  In response to a motion for rehearing, the court clarified its ruling, finding that counsel's failure to utilize Dr. Crago also was not prejudicial:

> On the issue of Dr. Crago not being called at the time of sentencing: THE COURT FINDS that there were a significant number of points which Dr. Crago's testimony would potentially have undermined for the defense.
>
> A.   Salazar stating that he had gone into the [victim's] house for purposes of burglary.  (In conflict with trial testimony)
>
> B.  That Salazar was "quite reactive to his environment" the expression of which may be the "releasing of aggressive or hostile impulses."
>
> C.  That Salazar's MMPI type indicated the possibility of "expression of anger – in acute outburst and it may involve dangerously assaultive behavior."
>
> D.   That the vivid recollection of events by Salazar would not have been consistent with an alcoholic blackout.
>
> E.   Salazar's statement to Dr. Crago that he had used cocaine on that day.  (Unlike trial testimony)
>
> These facts, which would have been presented if Dr. Crago had been called, could have undermined Salazar's position that he was not a perpetrator of the violence.  The conflict between Salazar's trial testimony and what was reported to Dr. Crago would have raised the issue of Salazar tailoring his position as needed.  The dubious benefit of Dr. Crago's testimony to the defense carried with it a significant danger of undermining several portions of the defense's case.

(*Id.* at 253-54.)

Petitioner sought review of the PCR court's ruling with the Arizona Supreme Court, which rejected each of Petitioner's IAC claims.  *Salazar*, 173 Ariz. at 415-16, 844 P.2d at 582-83.  The court agreed with the trial court that Dr. Crago's report "would likely have hurt defendant more than helped him."  *Id.* at 416, 844 P.2d at 583.  It also found that counsel ameliorated Petitioner's brother's testimony "by bringing out that defendant's violence was usually in response to provocation."  *Id.*

- 34 -

### B.    IAC Standard of Review

To prevail on an IAC claim, a petitioner must show that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The performance inquiry is whether counsel's assistance was reasonable considering all of the circumstances. *Id.* at 688-89.  "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689.

A petitioner must affirmatively prove prejudice. *Id.* at 693.  To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  The *Strickland* Court explained that "[w]hen a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  466 U.S. at 695.  In *Wiggins v. Smith*, the Court further noted that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."  539 U.S. 510, 534 (2003); *see also Mayfield v. Woodford*, 270 F.3d at 928.  The "totality of the available evidence" includes "both that adduced at trial, and the evidence adduced" in subsequent proceedings. *Wiggins*, 539 U.S. at 536 (quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)).

In order to assess and reweigh the aggravation and mitigation, this Court must consider the relevant provisions of Arizona's death penalty statute.  Under A.R.S. § 13-703(G), mitigating circumstances are any factors "relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or

- 35 -

record and any of the circumstances of the offense."  Mitigation evidence can be presented regardless of admissibility and need only be proven by a preponderance; the burden is on the defendant to prove mitigation.  A.R.S. § 13-703(C).  The court shall impose a sentence of death if it finds at least one aggravating circumstance and "that there are no mitigating circumstances sufficiently substantial to call for leniency."  A.R.S. § 13-703(E).

The Arizona courts assess whether mitigating factors are proven and consider "the quality and strength of those factors." *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006).  Mitigating evidence must be considered regardless of whether there is a "nexus" between the mitigating factor and the crime, but the lack of a causal connection may be considered in assessing the weight of the evidence.  *Id.*; *State v. Hampton*, 213 Ariz. 167, 185, 140 P.3d 950, 968 (2006) (finding horrendous childhood less weighty and not sufficiently substantial to call for leniency, in part, because not tied to the offense).  When the experts indicate that a defendant "knew right from wrong and could not establish a causal nexus between the mitigating factors and [the] crime," the Arizona courts may accord evidence of abusive childhood, personality disorders, and substance abuse limited value. *State v. Johnson*, 212 Ariz. 425, 440, 133 P.3d 735, 750 (2006).

### C.   Presumption of Correctness

Based on testimony presented at the PCR hearing, the state court made two factual findings that are important to this Court's assessment of Petitioner's IAC claims.  First, the state court determined that counsel made a tactical decision to continue the nonparticipation theory at sentencing, which required them to "attempt to portray Salazar as being withdrawn and quiet when intoxicated." (ROA II at 222-23.)  Second, the court found that counsel made a tactical decision not to present Dr. Crago at the penalty phase because his opinion that Petitioner "was a deeply disturbed individual who could be adversely affected by the use of alcohol and drugs" could have implicated him as the murderer.  (*Id.*)  The Arizona Supreme Court agreed with the trial court's factual findings:

- 36 -

1

2

3

4

> [D]efendant argues that counsel should have presented evidence from Dr. Crago on the effects of defendant's poly-substance abuse and emotional difficulties.  In ruling on the Rule 32 petition, the trial judge made a detailed analysis of Crago's report and how it tied in to the overall picture.  He concluded that Crago's testimony would likely have hurt defendant more than helped him.  The trial court concluded that not calling Dr. Crago was both professionally reasonable and non-prejudicial.  We agree.

5      *Salazar*, 173 Ariz. at 416, 844 P.2d at 583.

6      Whether a particular decision by counsel was a tactical one is a question of fact, and

7 the state court's resolution of that issue enjoys a strong presumption of correctness.  *See*

8 *Holsomback v. White*, 133 F.3d 1382, 1386-87 (11th Cir. 1998); *Jackson v. Herring*, 42 F.3d

9 1350, 1367 (11th Cir.1995.)  Whether a particular tactical decision was a reasonable one,

10 however, is a question of law reviewed de novo.  *Holsomback*, 133 F.3d at 1387.

11      The state courts' findings that counsel tactically decided to continue the

12 nonparticipation theory at sentencing and not to present the testimony of Dr. Crago are

13 entitled to a presumption of correctness.  *See* 28 U.S.C. § 2254(d); *Sumner v. Mata*, 455 U.S.

14 591, 591-92 (1982) (*per curiam*).  Thus, this Court must treat both findings as accurate

15 "unless one of the circumstances listed in section 2254(d)(1)-(7) exists, unless the [state

16 court] determination is not fairly supported by the state court record, or unless [Petitioner]

17 shows by convincing evidence that the factual determination by the state court is erroneous."

18 *Derrick v. Peterson*, 924 F.2d 813, 823-24 (9th Cir. 1990) (citation omitted).

19      Petitioner contends the presumption of correctness does not attach because "he was

20 denied resources and permission to retain a legal expert to help explain how this case should

21 have been analyzed pre-trial and after the verdict, but before sentencing." (Dkt. 153 at 1-2.)

22 Petitioner argues that "[a]n expert would have been able to point out to the PCR judge

23 exactly what trial counsel should have done and why he acted unreasonably in doing the

24 things he did." (Dkt. 153 at 3.)  The Court disagrees.

25      The trial court's task – assessing whether counsel's decision to continue the

26 nonparticipation defense and not to present Dr. Crago was a strategic decision – depended

27

28                                        - 37 -

1    on the testimony of trial counsel, not an expert witness.  Although an expert may have

2    provided another opinion about "what trial counsel should have done and why he acted

3    unreasonably in doing the things he did," an expert could not have explained trial counsel's

4    reasons for not utilizing Dr. Crago at sentencing.  Moreover, Petitioner's "legal expert" was

5    in no better position than Judge Veliz to opine "as to whether or not trial counsel was

6    effective according to local standards and was reasonable, and whether or not his actions

7    were prejudicial to the defendant." (ROA II at 695.)  The subject matter at issue here – the

8    local standards of competency for an effective lawyer – was clearly not beyond the common

9    knowledge of Judge Veliz, who had presided over "two hundred cases in the last four years."

10   (RT 12/4/87 at 135.)  *See Noland v. French*, 134 F.3d 208, 217 (4th Cir. 1998) (holding

11   petitioner was afforded a fair and adequate hearing in state proceeding even though state

12   court refused to allow attorney expert to testify about the objective standard of reasonable

13   competence for a lawyer trying a death penalty case; "when an expert witness is not in a

14   better position than the fact finder to render an opinion on a matter, it is not error to exclude

15   that witness' testimony"); *LaGrand v. Stewart*, 133 F.3d 1253, 1270 n.8 (9th Cir. 1998)

16   (holding that *Strickland* does not require that expert testimony of outside attorneys be used

17   to determine the appropriate standard of care).  Thus, Petitioner was not prejudiced by the

18   state court's decision not to appoint a "legal expert" at the PCR proceeding, and the Court

19   rejects Petitioner's contention that the state court's decision not to appoint such an expert

20   denied him the opportunity to develop the argument that counsel performed deficiently at

21   sentencing.

22       Petitioner's arguments that the record does not support the state court's findings, and

23   thus are not entitled to a presumption of correctness, are addressed below.

24   **D.    Claims A-21 & A-22: Performance Prong**

25       Petitioner contends that counsel rendered ineffective assistance by continuing the

26   nonparticipation theory at the penalty phase and failing to present evidence of Petitioner's

27

28                                          - 38 -

1   psychological problems and character when intoxicated, both of which "strongly suggested

2   that he was unable to control his violent behavior."[17]   (Dkt. 137 at 23-24.)   Petitioner also

3   criticizes counsel's continuation of the nonparticipation theory once Judge Veliz rejected a

4   similar defense in Davis's case.   (*Id.* at 7, 19-20.)

5          1.     Counsel's Investigative Efforts

6        As a preliminary matter, the Court rejects Petitioner's contention that Hurd failed to

7   conduct an investigation or confer with anyone about the mitigation strategy.   (Dkt. 153 at

8   10-12.)   Hurd enlisted an investigator, who interviewed a number of Petitioner's family and

9   friends.[18]   (ROA I at 94.)   The investigator learned from an interview with Petitioner's

10   mother and father that the stabbing death of Petitioner's brother was particularly traumatic

11   and "deeply affected" Petitioner, that Petitioner's parents were unaware he had become

12   heavily involved in drugs or alcohol, that they never detected any signs of mental illness in

13   Petitioner, and that Petitioner had started living away from home in his early teens.   (Dkt.

14   154, Ex. 4.)   An interview with Catherine Townsley, a former girlfriend of both Davis and

15   Petitioner, revealed that Petitioner had "two sides of his personality."   (Dkt. 154, Ex. 6.)   She

16   described him as a mellow person generally, but indicated that on occasion he would fly into

17

---

18        [17]     Petitioner also asserts that counsel neglected to investigate and present

19   evidence regarding Petitioner's "dysfunctional" upbringing, history of drug and alcohol
    abuse, good character when sober, and good conduct during pretrial incarceration.   (Dkt. 153

20   at 24-31.)   Petitioner did not properly exhaust in state court a claim based on these aspects
    of counsel's representation.   Moreover, Petitioner's argument is based on the evidence that

21   was in fact before the sentencing judge via the reports of Drs. Boyer and Ginnetti and the

22   presentence report, including the letters from friends and family appended thereto.   (*See id.*)

23        [18]     The investigator, Robert Annenberg, did not testify at the state PCR hearing.

24   According to motions for payment filed by defense counsel, it appears Annenberg spent 75.9
    hours investigating the case; it is uncertain how many of these hours related to potential

25   mitigating evidence.   (ROA I at 113, 130, 428, 440, 441.)   Other than memos from two

26   specific interviews with background witnesses, Petitioner has not proffered either
    Annenberg's complete investigative file or any detailed billing statements.   Thus, the full

27   extent of his investigation into Petitioner's background is unknown.

28

a rage and become violent. (*Id.*) She said Petitioner had once choked a friend and had to be pulled off of him and on another occasion had tried to choke a cat. (*Id.*) She also claimed to have seen Petitioner and Davis following the murder and to have heard Petitioner say he had strangled an "old lady." (*Id.*)

Petitioner also sought the appointment of an independent expert to assess Petitioner's mental condition and state of mind at the time of the offense. (ROA I at 100.) The record is devoid of evidence that "Hurd never discussed Dr. Crago's reports or its sentencing implications" with Petitioner, as now alleged. (*Id.* at 11.) Notwithstanding the extensive PCR proceeding, Petitioner failed to elicit such testimony from Hurd or Dr. Crago and failed to provide it himself. Instead, he relies on vague descriptions in counsel's time records. Rather than confirming Petitioner's argument, however, these records reflect that counsel researched insanity based on a prolonged use of drugs and conferred with Petitioner prior to trial "regarding psychiatrist." (ROA I at 410.)

Nor is there evidence to support Petitioner's assertions that Hurd never asked about Dr. Crago's conclusions and never conferred with lead counsel Redondo about their sentencing strategy. (Dkt. 153 at 12.) Petitioner's assertion that Hurd did not remember comparing Dr. Crago's report with Dr. Boyer's report (*id.* at 8) is also inaccurate. Although he had no specific recollection, Hurd testified that he possessed both reports and thinks he would have read and compared them. (RT 3/9/90 at 139.) Hurd also testified that the defense had "no conclusive evidence either way" as to whether Petitioner became aggressive or withdrawn when he was intoxicated; rather, there was evidence on both sides of the issue. Hurd's testimony confirms that counsel did not fail to investigate the possibility that Petitioner became violent when intoxicated. Thus, the Court rejects Petitioner's conclusory assertions that counsel failed to investigate mental impairment and intoxication as potential mitigating factors.

1          2.       Portrayal of Defendant as Non-violent

2          Petitioner argues that counsel's theory that Petitioner "didn't commit the crime . . .

3   and was a mellow drunk" was unsupported by and "at odds with all of the available

4   evidence." (*Id.* at 14-15.) He contends that "the mental health evaluations, the pre-sentence

5   reports, the court clinic evaluations, the MMPI's, and the witnesses supported a finding that

6   [he] was a disturbed young man, who suffered from serious, mental illness and often became

7   uncontrollably violent when intoxicated." (*Id.* at 27.) This, Petitioner argues, "strongly

8   supported a statutory mitigating factor, i.e., that [he] did not have the capacity to appreciate

9   the wrongfulness of his acts or conform his conduct to the requirements of the law." (Dkt.

10  153 at 5-6.) The Court disagrees.

11         First, the record does not support Petitioner's assertion that all of the mental health-

12  related evidence supported a finding that Petitioner suffered from a serious mental illness.

13  Of the five psychologists who examined him, only Dr. Crago diagnosed Petitioner as

14  suffering from a mental disorder other than depression and substance abuse (Dkt. 63, Ex. PP

15  at 4-5); the other four doctors found no evidence of "any derailment of thinking or psychotic

16  thinking" (Dr. LaWall), "bizarre or inappropriate behavior" (Dr. Gurland), "major mental

17  disorder" (Dr. Boyer), or "formal thought disorder" (Dr. Ginnetti). (Dkt. 63, Ex. WW at 1,

18  Ex. VV, Ex. TT at 5, Ex. OO at 2-3; *see also* RT 3/9/90 at 8-9; RT 4/13/90 at 18-19.)

19  Moreover, although Dr. Crago testified that Petitioner's MMPI scores presented him as an

20  individual with "tendencies toward paranoid schizophrenia," he was not able to determine

21  whether Petitioner was in fact functioning as a paranoid schizophrenic at the time of the

22  crime because Petitioner denied participating in the killing. (RT 3/9/90 at 54-57.) By

23  contrast, Drs. LaWall and Boyer concluded that no evidence suggested Petitioner did not

24  understand the nature, quality, and consequences of his actions at the time of the crime.

25  (Dkt. 63, Ex. WW at 2; RT 4/13/90 at 20-21.) Likewise, Dr. Gurland opined that Petitioner

26  "appears to have been mildly to moderately intoxicated [at the time of the crime], however,

27

28                                    - 41 -

1    he was certainly aware of the nature and quality of his acts and knew right from wrong at that

2    time." (Dkt. 63, Ex. VV.)  Finally, Petitioner never told Dr. Boyer that being intoxicated

3    "altered his behavior in any bizarre or irrational kinds of ways," and neither the IQ test

4    results she examined nor the MMPI she administered reflected the extent of mental problems

5    found by Dr. Crago.  (RT 4/13/90 at 31-32, 46, 49-50.)

6         Second, notwithstanding Petitioner's argument to the contrary, Dr. Crago's opinion

7    did not provide the requisite proof to establish A.R.S. § 13-703(G)(1), which provides as a

8    mitigating factor that the defendant's "capacity to appreciate the wrongfulness of his conduct

9    or to conform his conduct to the requirements of the law was significantly impaired, but not

10   so impaired as to constitute a defense to prosecution." Dr. Crago concluded that, if Petitioner

11   had in fact committed the murder, "it is highly possible" "he was insane or irrational at the

12   time" because "extreme alcohol intoxication and especially cocaine intoxication often

13   precipitate psychotic behavior even in individuals who are much less disturbed than"

14   Petitioner. (Dkt. 63, Ex. PP at 5-6.)  Because he denied murdering the victim, however, Dr.

15   Crago acknowledged it was "impossible to accurately assess [Petitioner's] sanity" and

16   "whether he knew right from wrong" at the time of the crime. (*Id.*)  Thus, even assuming Dr.

17   Crago had been permitted to opine that Petitioner was a borderline schizophrenic, he could

18   not have testified that Petitioner's capacity to appreciate the wrongfulness of his conduct, or

19   to conform his conduct to the requirements of the law, was significantly impaired unless

20   Petitioner admitted committing the murder.

21        When the presentence hearing took place, Petitioner had denied committing the

22   murder to Drs. Gurland and LaWall, as well as to Dr. Crago, the court, and the jury.

23   Admitting guilt at the penalty phase, after so vehemently and consistently denying

24   participation in the crime during the guilt phase, would have harmed Petitioner's credibility.

25   Any defect in Petitioner's credibility would have directly compromised the credibility of Dr.

26   Crago's report and conclusions because he had relied on everything Petitioner told him in

27

28                                          - 42 -

reaching his conclusions; he did not cross-check any police reports or other data to confirm Petitioner's story.  (RT 3/9/90 at 26-27, 30-32, 35-36, 87.)  Similarly, several of Petitioner's statements to Dr. Crago conflicted with his testimony at the guilt phase, a fact which the prosecution likely would have highlighted if Dr. Crago's testimony or report had been admitted.  Inconsistencies in Petitioner's story would have harmed his credibility further, again damaging the credibility of Dr. Crago's report.

In addition to being speculative, Dr. Crago's testimony would have been valuable only to the extent that Petitioner could actually show he was extremely intoxicated at the time of the crime.  Dr. Crago acknowledged that, if Petitioner was not under the influence, "the chances are much less that he would have been psychotic."  (*Id.* at 30.)  Other than Petitioner's testimony that he had been drinking all day and was "very drunk" at the time of the crime (RT 12/10/87 at 106-10, 133-34), there was little reliable evidence to support the contention that he was extremely intoxicated.

One witness, James Teran, confirmed that Petitioner and Davis were drinking a bottle of alcohol the night of the murder, but he did not know how much Petitioner had to drink before or after that period.  (RT 12/10/87 at 60-62, 64, 71.)  He could not remember whether Petitioner exhibited any symptoms of intoxication because he too had been drinking all day and was "plastered."  (RT 12/10/87 at 62-64.)  In addition, Petitioner gave a detailed account of the events on the night of the murder.  Indeed, based on Petitioner's "clear and coherent account of his behavior and its motivation at the time of the offense," and his "quite intact" memory, Dr. LaWall found "no evidence to suggest [Petitioner] did not understand the nature, quality and consequences of his actions at the time of the alleged offense."  (Dkt. 63, Ex. WW at 1-2.)  Dr. Gurland likewise concluded that Petitioner "appears to have been mildly to moderately intoxicated, however, he was certainly aware of the nature and quality of his acts and knew right from wrong at that time."  (Dkt. 63, Ex. VV.)  Similarly, Petitioner's act of discarding his shoes immediately after the murder seriously undermines

any assertion that he lacked the capacity to appreciate the wrongfulness of his conduct, or the ability to conform his conduct to the requirements of the law.  Although Dr. Boyer did not evaluate Petitioner on "[t]he issue of mental state at the time of the alleged offense," neither the collateral information she reviewed nor her interview of Petitioner raised any serious possibility that he suffered from a psychotic mental disorder at the time of the murder.  Petitioner's detailed recollection of the events on the night of the murder, his decision to discard his shoes, and the testimony of Drs. Gurland, Boyer, and LaWall undermine the argument that Petitioner was extremely intoxicated at the time of the crime.  Thus, Dr. Crago's testimony that Petitioner becomes uncontrollably violent when extremely intoxicated would have been only minimally helpful to his defense.

Third, Petitioner's assertion that the "mellow drunk" theory was unsupported by the evidence is itself belied by the record.  Petitioner's parents testified that he did not have a bad temper and never got into trouble for acting aggressively or exhibiting violent behavior.  Petitioner's mother specifically denied seeing Petitioner become aggressive when he was intoxicated.  (RT 1/14/88 at 6-7, 12-14, 17, 20-21.)  Petitioner's brother admitted having seen Petitioner become violent and "explode" when he drank "hard liquor," but testified that "[m]ost of the time he would become quiet" and withdrawn.  (RT 1/14/88 at 28, 30-31.)  Many of the letters appended to the presentence report characterized Petitioner as a non-violent person who stayed out of trouble and as a caring person who helped others.

Similarly, Petitioner himself testified during the guilt phase that there was no way he could have hit the victim and not remembered it.  (RT 12/10/87 at 132.)  At the presentence hearing, Petitioner submitted a letter to the judge denying both a propensity for violence in general and participation in the murder.  Just before the court pronounced sentence, Petitioner once again urged the court to accept that he did not kill the victim.  (RT 2/9/88 at 20.)  In addition to counsel, the court, and the jury, Petitioner unequivocally told each of the four psychologists who evaluated him that he was not present when Davis murdered the victim.

1   Indeed, Petitioner's denial to Dr. Boyer occurred nearly six weeks after the jury convicted
2   him of murder.

3       Fourth, the evidence from lay witnesses that Petitioner asserts should have been
4   presented at sentencing was not conclusive as to his propensities when intoxicated.
5   Petitioner points to the post-conviction interviews of four friends, who described violent acts
6   by Petitioner when he was under the influence of drugs or alcohol.  However, four others
7   interviewed by the PCR investigator did not have any such evidence and, as just explained,
8   Petitioner's parents and brother described him as generally non-aggressive when intoxicated,
9   a characterization consistent with Petitioner's self-description.  Moreover, the interviews do
10  not demonstrate that counsel's decision to continue the nonparticipation theory at sentencing
11  was unreasonable because none of these individuals could have testified that Petitioner was
12  intoxicated at the time of the crime.  Thus, even assuming the witnesses could verify that
13  Petitioner had previously acted violently when intoxicated, none could verify that Petitioner
14  had been intoxicated at the time of the murder.  *See Williams v. Woodford*, 384 F.3d 567, 616
15  (9th Cir. 2004) (finding reasonable counsel's decision to forgo drug use evidence as
16  mitigation where no witness provided basis to believe the petitioner's behavior at the time
17  of the crime was affected by drugs and facts of crime reflected petitioner's deliberate and
18  methodical action).

19      Hurd testified during the PCR hearing that if he had known of additional lay witnesses
20  who supported Dr. Crago's report that Petitioner became aggressive when intoxicated, it may
21  have given him a different view of the case.  (RT 3/9/90 at 157-58.)  However, he did not
22  know whether this information would have caused him to take a different strategic approach
23  to the case, admitting that he was reluctant to vary from the defense's original strategy:  that
24  Petitioner "didn't do it and he's not the type of person that would do it, that Davis did it."
25  (*Id.* at 159-60.)  Hurd also agreed there were risks in presenting a client during a capital
26  sentencing proceeding "as a person who becomes aggressive and assaultive and attempts to

27

28                                    - 45 -

1    strike and strangle people." (*Id.* at 160.)  The Court concludes that counsel's failure to

2    further investigate witnesses who could testify about Petitioner's violent drunken episodes

3    was reasonable.  *See Strickland*, 466 U.S. at 690-91 ("strategic choices made after less than

4    complete investigation are reasonable precisely to the extent that reasonable professional

5    judgments support the limitations on investigation").

6            Fifth, the evidence supported counsel's decision to continue the nonparticipation

7    theory at the penalty phase.  As defense counsel reiterated at sentencing, physical evidence

8    implicating Davis was located closer to the victim's body and the bed where she was killed

9    than the physical evidence implicating Petitioner.  Because the victim was killed in a fairly

10   confined space, the location of the evidence supported the argument that Davis, not

11   Petitioner, committed the murder.  Petitioner proffered a reasonable explanation for

12   discarding his shoes, which he did only after being told Davis had killed someone.  Petitioner

13   admitted owning the Tiger shoes, rather than the Pro-Wings that matched shoe prints found

14   on the victim's bed.  Dr. Jones confirmed that no flesh or blood was found under the victim's

15   fingernails and the nail clippings collected from her were never tested, thus supporting

16   Petitioner's denial that he was scratched by the victim.  Dr. Jones also agreed that the

17   evidence supported one assailant committing the crime and opined that the victim's arm was

18   not bruised as it likely would have been if Petitioner had stepped on it.  Bode's serology

19   report does not create an obvious conflict in the evidence, even though it demonstrated that

20   red smears near Petitioner's palm print were human blood.  While the judge was aware that

21   the blood in these smears was consistent with that of the victim (a fact withheld from the

22   jury), the substance in which Petitioner left a palm print was never tested or linked to the

23   victim, and Petitioner plausibly suggested it may have been blood from his cut hands.  Thus,

24   it was not inconceivable that the nearby but separate blood smears that were likely from the

25   victim may have been left by Davis.

26           Based on the foregoing, the Court concludes that Petitioner has failed to prove that

27

28                                              - 46 -

1   the sentencing decisions of counsel fell outside of the wide range of constitutionally adequate

2   representation.  Based on their investigative efforts, counsel were aware that Petitioner came

3   from a large family, was severely affected by his brother's death, abused drugs and alcohol,

4   and had violent propensities when intoxicated.  However, much of this evidence was weak,

5   especially that of Dr. Crago, who was the only expert to find any mental impairment and

6   whose opinion that Petitioner may not have been in control of his conduct hinged on whether

7   Petitioner was actually intoxicated, a fact at odds with Petitioner's detailed recollection of

8   the crime and the events that occurred afterwards.  Additionally, given the double-edged

9   nature of the available psychological evidence, it was not unreasonable for counsel to have

10  concluded that any slight benefit from Dr. Crago's opinion and lay witness testimony

11  confirming Petitioner's propensity for violence when intoxicated might have revealed factual

12  matters that would have harmed Petitioner's chances for a life sentence.  Any attempt to

13  portray Petitioner as a violent man would have opened the door for the State to argue that he

14  specifically committed the murder and lied about not being violent and aggressive.  Evidence

15  that Petitioner became violent when intoxicated had not previously been admitted in

16  evidence, and counsel reasonably could have viewed it as particularly damaging.  Moreover,

17  counsel knew that there would be at least one mitigating factor – the uncontested fact that

18  Petitioner had not previously been convicted of a violent felony – should the judge not credit

19  the nonparticipation theory.  Thus, instead of presenting evidence that Petitioner was

20  extremely violent and volatile when intoxicated, defense counsel made a reasonable tactical

21  decision to capitalize on any lingering doubts about Petitioner's actual involvement in the

22  crime and to keep from the judge any evidence that Petitioner may have actually perpetrated

23  the murder.  *See  Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997) (holding

24  counsel's failure to introduce mitigating evidence during sentencing hearing was not

25  deficient because "[c]ounsel knew about the evidence and looked into it, but chose as a

26  tactical matter not to use it").

27

28                                              - 47 -

1    Petitioner cites a number of cases for the proposition that the failure to investigate and

2  present all available mitigating evidence constitutes ineffective assistance of counsel.  His

3  view thus appears to be that, in every capital punishment case, it is mandatory for counsel

4  to prepare and present to the sentencing tribunal any evidence that could be used to establish

5  a mitigating circumstance, and certainly any evidence of the defendant's psychological state.

6  Implicit in this argument is the novel proposition that counsel may not make the kind of

7  tactical decision made here – to employ a mitigation defense that is inconsistent with, and

8  thus requires exclusion of, available psychological evidence.

9    Petitioner's argument improperly focuses on what evidence his counsel could have

10 presented, rather than whether the choices made by counsel were reasonable.  *Siripongs v.*

11 *Calderon*, 133 F.3d 732, 736 (9th Cir. 1998).  Counsel have substantial leeway in making

12 strategic and tactical decisions about how to present a case at a capital sentencing hearing

13 and are not required to present every conceivable mitigation defense if, after proper

14 investigation and review, they conclude that it is not in the defendant's best interest to do so.

15 *Darden v. Wainwright*, 477 U.S. 168 (1986) (trial counsel's decision not to introduce

16 mitigating evidence not deficient because such evidence would have allowed prosecution to

17 introduce damaging evidence); *Burger v. Kemp*, 483 U.S. 776, 793 (1987) (finding no IAC

18 where counsel declined to present evidence of defendant's violent tendencies that was at

19 odds with trial strategy of portraying defendant's actions as result of co-defendant's strong

20 influence on his will).

21    This Court's conclusion that counsel's decision to continue the nonparticipation

22 defense in lieu of admitting guilt and asserting that voluntary intoxication rendered the

23 defendant unable to control his conduct is supported by the Ninth Circuit's decision in

24 *Williams v. Woodford*.  There, the Court noted:

25       [T[he defense of "'residual doubt has been recognized as an extremely
         effective argument for defendants in capital cases.'" *Lockhart v. McCree*, 476
26       U.S. 162, 181, (1986) (quoting *Grigsby v. Mabry*, 758 F.2d 226, 248 (8th Cir.
         1985) (en banc) (Gibson, J., dissenting)).  A comprehensive study on the

27

28                                              - 48 -

opinions of jurors in capital cases concluded:

> "Residual doubt" over the defendant's guilt is the most powerful "mitigating fact." . . . [T]he best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?,* 98 COLUM. L. REV. 1538, 1563 (1998) (footnote omitted); *accord* William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases,* 15 AM. J. CRIM. L. 1, 28 (1988) ("The existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied.").

384 F.3d at 624. As in this case, defense counsel in *Williams* believed that evidence of the petitioner's troubled background "was by no means helpful because it suggested violent propensities that were at odds with the goal of portraying Williams as less culpable." *Id.* at 616. In addition, as here, the evidence of diminished mental capacity in *Williams* "lacked support in the opinions of the mental-health experts that examined Williams and in the facts of the case." *Id.* at 617. Finally, in another parallel with the instant case, the facts of the crimes in *Williams* "reflected deliberate and methodical action;" thus, witness statements provided no basis for believing that the petitioner's behavior or thought patterns at the time of the crimes had been materially affected by drugs. *Id.*

3.     Davis's Sentencing

On December 3, 1987, eleven days before the jury convicted Petitioner of murder, Davis filed a presentence memorandum arguing that Petitioner returned to the victim's house and murdered her after Davis and Petitioner had initially fled the premises. (Davis RT 12/3/87 at 1.) On December 22, 1987, after Petitioner's conviction, Judge Veliz sentenced Davis to death. (Davis RT 12/22/87.) Thus, on January 14, 1988, when counsel filed Petitioner's presentence memorandum, three weeks had passed since Judge Veliz sentenced Davis to death.

Petitioner argues that the nonparticipation mitigation theory became untenable, and

thus should have been abandoned, after Judge Veliz rejected essentially the same mitigation theory when he sentenced Davis to death.  Petitioner contends counsel's decision to continue the nonparticipation theory at sentencing effectively amounted to no assistance of counsel because, in the sentencing findings issued in Davis's case, which were substantially similar to that in Petitioner's later sentencing, Judge Veliz indicated Petitioner was a "major participant" and "actively involved" in the crime.  (Dkt. 153 at 19-21, 44-45.)

At first glance, these circumstances appear to support Petitioner's argument that counsel performed unreasonably in adhering to the nonparticipation theory after Judge Veliz issued his findings in Davis's case indicating that Petitioner had in fact participated in the murder.  The Court rejects this contention, however, because Judge Veliz's findings with respect to Davis's sentence were based solely on the evidence presented in Davis's case, where the defense theory "attempted to shift the blame onto Mr. Salazar" and did not take into account the additional evidence presented at Petitioner's trial.  (Dkt. 137 at 30.)

Davis and Petitioner presented different defenses and evidence at their separate guilt and penalty phases.  At the outset of the guilt phase of his trial, Davis relied on a "withdrawal from the scene before the murder took place" theory, but later switched to an "insufficiency of the evidence" theory.[19]  (Dkt. 63, Ex. Q at 4.)  As a result, Davis did not testify or present any witnesses at the guilt phase, but instead rested on the weakness of the State's evidence.  (*Id.* at 3.)  At the penalty phase, no witnesses testified in support of Davis's claim that he was not violent or aggressive, but several letters to that effect were submitted and Davis told the court he was innocent because Petitioner murdered the victim.

Petitioner, by contrast, consistently relied on the nonparticipation theory during the guilt phase and provided three witnesses and his own testimony in support thereof.

---

[19]     Davis's initial theory was that he and Petitioner fled the house upon seeing the victim.  Petitioner later returned to the house alone and killed the victim to prevent her from identifying him as a burglar.  (Dkt. 63, Ex. Q at 1.)

- 50 -

1    Petitioner's testimony specifically denied and explained several of the factual findings
2    referenced in Davis's sentencing order.  For example, in sentencing Davis, the court
3    specifically found that (1) Davis and Petitioner "knew a frail elderly woman lived" at the
4    house where "they removed the wrought irons on the window," (2) both "men knew that the
5    residence was occupied" because "the television was on" when they entered, (3) "the
6    fingerprint of defendant Salazar, in blood, [was] found immediately adjacent to those where
7    the strangled body was located," (4) one set of footprints was found under the victim's body
8    and the other was left on the table where the victim had been stepped on and there was an
9    imprint on the arm and table, (5) "there were scratches on Salazar's chest," and (6) "how the
10   entry was made, where the bedroom was, and the footprints and fingerprints of both
11   defendant's [sic] instead show, beyond a reasonable doubt, that both were present when Ms.
12   Kaplan was murdered."  (Dkt. 154, Ex. 2 at 2-5.)  When Petitioner testified, however, he
13   specifically denied knowing the victim and that the house was occupied, removing the
14   wrought iron bars, hearing the victim's television, and being scratched by and stepping on
15   the victim.  In addition, Petitioner plausibly explained that Davis may have turned on the
16   television set before or after killing the victim; that Petitioner's hands were cut from working
17   and thus he could have left his own blood on the victim's file cabinet; that Davis disappeared
18   after they entered the house, while Petitioner entered a dark doorway out of curiosity; and
19   that Petitioner was wearing the Tiger shoes, not the Pro Wings shoes that left bloody shoe
20   prints on the bed.[20]  Moreover, Dr. Jones testified that the victim had nothing under her
21   fingernails, thus casting doubt on the testimony that Petitioner's chest was scratched, and the
22   defense presented evidence to support a finding that the "imprint" on the victim's arm was
23
24
25
_____

26        [20]     At Davis's trial, counsel argued that Petitioner wore the Pro Wings but
27   presented no evidence that Davis was wearing the Tiger shoes.

28                                            - 51 -

dust, not a shoe print.[21]   None of this evidence, or evidence similar to it, was offered at Davis's trial, and Davis did not testify or present witnesses.  In addition, at his presentence hearing, Petitioner presented three witnesses to testify he was not violent or aggressive, and he made a statement to the court asserting his innocence and denying a violent disposition.

Based on significant differences in the evidence presented at Petitioner's and Davis's trials, as well as the fact that Judge Veliz was precluded from considering evidence presented at Petitioner's trial when sentencing Davis (and vice versa),[22] counsel could have reasonably decided to present the nonparticipation mitigation theory at the penalty phase even though a similar mitigation theory had been rejected by Judge Veliz in Davis's case.  At Petitioner's presentence hearing, Hurd knew that Davis had been sentenced to death based on Judge Veliz's conclusion that he murdered the victim.  Counsel could have reasonably concluded that, on the basis of the evidence presented at Petitioner's trial, Judge Veliz would believe Petitioner's testimony that Davis was the lone assailant and sentence Petitioner to life in prison rather than death.  Thus, counsel's decision to continue the same nonparticipation mitigation strategy as the one that had failed in Davis's case was not unreasonable.

4.   Conclusion

As a tactical matter, counsel reasonably decided not to present evidence concerning Petitioner's propensity for violence when intoxicated because it could have backfired and led the court to conclude that Petitioner, not Davis, committed the murder.  *See Williams*, 384 F.3d at 616.  Thus, counsel's performance at sentencing was not deficient.

---

[21]   This evidence included testimony from two prosecution witnesses that the victim's arm appeared to have been moved at some point during the investigation, Dr. Jones's testimony that the victim's arm was not bruised as it likely would have been if Petitioner had stepped on it, and his testimony that blood drops near the table top would have been smeared if someone had stepped there when the blood was wet.

[22]   Under both Arizona law and the United States Constitution, a trial judge may consider only evidence introduced at the trial or penalty phase of the defendant being sentenced.  *See* A.R.S. § 13-703(D); *Gardner v. Florida*, 430 U.S. 349, 362 (1977).

1      **E.      Claims A-21 & A-22: Prejudice Prong**

2          Even assuming counsel provided deficient performance by continuing to pursue the

3    nonparticipation theory at the penalty phase and forgoing available psychological and

4    intoxication evidence, Petitioner has not shown that the failure to introduce Dr. Crago's

5    testimony and supporting testimony from lay witnesses "undermined confidence in the

6    outcome" of the sentencing proceeding.  *Strickland*, 466 U.S. at 694.

7          1.      Applicability of *Cronic*

8          Petitioner contends a presumption of prejudice "applies when there has been an

9    '[a]ctual or constructive denial of the assistance of counsel altogether,'" and thus *United*

10   *States v. Cronic*, not *Strickland*, governs the analysis of his penalty-phase IAC claims.  (Dkt.

11   137 at 12.)  By continuing to present "false information" about his character and participation,

12   Petitioner posits, counsel "failed to subject the prosecution's case to meaningful adversarial

13   testing" and "effectively acted as a second prosecutor."  (Dkt. 137 at 12-15; Dkt. 153 at 44-

14   46.)  The Court disagrees that *Cronic* applies here.

15         In Sixth Amendment right-to-counsel cases, prejudice is presumed only where the

16   circumstances "are so likely to prejudice the accused that the cost of litigating their effect in

17   a particular case is unjustified."  *Cronic*, 466 U.S. 648, 658 (1984).  The Supreme Court has

18   cautioned, however, that this presumption of prejudice applies only in those rare cases where

19   counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing."

20   *Id.* at 659.  In order to meet this standard, "the attorney's failure to test the prosecutor's case"

21   "must be complete," such as when "counsel fail[s] to oppose the prosecution throughout the

22   sentencing proceeding as a whole," rather than "at specific points."  *Bell v. Cone*, 535 U.S.

23   685, 697 (2002).  Likewise, the Ninth Circuit limits the application of *Cronic* to cases

24   involving "the 'complete denial of counsel' and comparable circumstances," including

25   "where a defendant 'is denied counsel at a critical stage of his trial,'" and "where the

26   circumstances are such that 'the likelihood that any lawyer, even a fully competent one,

27

28                                    - 53 -

could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial,'" such as "where 'counsel labors under an actual conflict of interest.'" *Visciotti v. Woodford*, 288 F.3d 1097, 1106 (9th Cir. 2002), *rev'd on other grounds*, 537 U.S. 19 (2002).

There is no evidence whatsoever that the present case is one of those rare cases justifying a presumption of prejudice. *See, e.g.*, *United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991) (prejudice presumed where counsel conceded in argument to jury that there was no reasonable doubt regarding key factual issue in dispute); *Javor v. United States*, 724 F.2d 831 (9th Cir. 1984) (where counsel sleeps through substantial portion of trial no prejudice need be shown). Rather, counsel's efforts to advocate Petitioner's case during the penalty phase were substantial. Counsel prepared a lengthy sentencing memorandum, put on and examined three defense witnesses, collected and submitted numerous letters in support of Petitioner, and delivered a strong argument before the court imposed a sentence. The failure to adduce the mitigating evidence challenged here is "plainly of the same ilk as other specific attorney errors subject to *Strickland's* performance and prejudice components." *Bell*, 535 U.S. at 688. Moreover, there is nothing in the record to indicate counsel "had a conflict of interest, sympathized with the prosecution, was hostile to [their] client, or wanted him to be convicted." *Visciotti*, 288 F.3d at 1106. Thus, counsel's overall performance at the penalty phase did not entirely fail "to subject the prosecution's case to meaningful adversarial testing," nor leave Petitioner completely without representation. *Cronic*, 466 U.S. at 659. The Court's discussion will therefore proceed under the *Strickland* standard, by which Petitioner must affirmatively prove prejudice.

2.    Analysis

Petitioner argues that, had counsel presented evidence from Dr. Crago that Petitioner suffered from Mixed Personality Disorder, with schizotypal, borderline, paranoid, antisocial and avoidant features, as well as evidence from lay witnesses concerning Petitioner's violent

1    tendencies when intoxicated, there is a reasonable probability that he would not have been

2    sentenced to death because such evidence "would have provided the court with a clear, and

3    at least understandable, mitigating explanation for Mr. Salazar's behavior." (Dkt. 153 at 21.)

4    The Court is not persuaded.

5          First, the Court agrees with the PCR court and the Arizona Supreme Court that the

6    evidence Petitioner claims should have been presented by Dr. Crago and the lay witnesses

7    at the penalty phase was potentially more harmful than beneficial.   In addition to

8    undermining Petitioner's position that he was not the perpetrator of the violence, Dr. Crago's

9    testimony presented a significant risk of damaging several other portions of the defense case.

10   For example, Petitioner told Dr. Crago he remembered even insignificant details from the

11   night of the murder, which cuts against testimony he gave of being very drunk.  Petitioner's

12   detailed and vivid account of the night of the murder seriously undercuts the argument that

13   he was severely intoxicated at the time of the crime, and effectively suggests no "blackout"

14   or uncontrollable outburst occurred.  Petitioner admitted to Dr. Crago that he used cocaine

15   on the day of the murder, but he did not admit using cocaine when he testified at trial or

16   spoke with Drs. Gurland, LaWall, and Boyer.  Petitioner told Dr. Crago he went into the

17   victim's house in order to commit burglary, which conflicts with testimony he gave that the

18   house was vacant and he entered out of curiosity.   Thus, not only would Dr. Crago's

19   testimony undermine Petitioner's contention that he was not the perpetrator of the violence,

20   but, as observed by the PCR court, conflicts between Petitioner's trial testimony and what

21   he told Dr. Crago "would have raised the issue of Salazar tailoring his position as needed."

22   (ROA II at 254.) Conflicts between the detailed testimony of Petitioner at the guilt phase and

23   the many inconsistencies between what Petitioner told Dr. Crago and what he testified to

24   before the jury would have hurt his credibility with the sentencing court.  Also, any harm to

25   Petitioner's credibility would have reduced the value of Dr. Crago's opinion.  Dr. Crago

26   admitted his diagnosis was heavily dependent on Petitioner's statements to him and based

27

28                                        - 55 -

on the assumption that Petitioner had told him the truth.  Thus, if Judge Veliz determined that Petitioner had lied to Dr. Crago, the doctor's opinion would have been suspect and probably deemed unreliable.  Judge Veliz was responsible for evaluating Petitioner's truthfulness, as well as the mitigating weight assigned to, and credibility of, Dr. Crago's opinion.  Because conflicts between Petitioner's guilt phase testimony and the information he provided Dr. Crago would have presented a substantial risk of alienating Judge Veliz and undermining the mitigation theory, Petitioner was not prejudiced by counsel's failure to present Dr. Crago's opinion.

Second, whatever value the omitted testimony of Dr. Crago might have had was substantially lessened because he could not unequivocally state that Petitioner's consumption of drugs or alcohol the night of the murder had altered his mental state in a definite or predictable manner.  Rather, because Petitioner continually denied participating in the murder, Dr. Crago acknowledged that it was impossible for him to determine whether Petitioner was in fact functioning as a paranoid schizophrenic at the time of the crime.  Unless Petitioner was willing to admit he committed murder, Dr. Crago could have opined only that Petitioner was suffering from a mental defect which made him particularly susceptible to violent and uncontrollable outbursts when he was extremely intoxicated.

Similarly, Dr. Crago's opinion was not compelling because evidence that Petitioner was extremely intoxicated at the time of the crime was sketchy.  Other than Teran, who described himself as being "plastered" at the time, no other witness confirmed Petitioner's self-serving testimony that he was very drunk at the time of the crime.  Drs. LaWall, Gurland, and Boyer each provided testimony that contradicted Petitioner's claim of impaired capacity at the time of the crime, and much of Petitioner's guilt phase testimony was inconsistent with a defense premised upon an intoxication-based mental disorder.  For example, Petitioner recounted in vivid detail his actions before, during, and after breaking into the victim's home.  Indeed, while discussing the jury instructions with counsel, Judge

Veliz noted that no evidence had been presented to show Petitioner was "intoxicated," although he agreed there was evidence that Petitioner had "been drinking." (RT 12/11/87 at 18.) Because no reliable testimony supports the claim that Petitioner was intoxicated at the time of the crime, he was effectively unable to offer any psychological evidence that he was suffering from a mental disorder at the time of the crime. In sum, there was no point in raising a psychological or intoxication defense in the absence of any evidence to support it. Thus, counsel's failure to do so cannot have prejudiced Petitioner. Because Dr. Crago's opinion was limited by Petitioner's testimony and the absence of evidence to support an intoxication-based mental defense, the evidence that Petitioner claims should have been introduced at sentencing was neither compelling nor exculpatory. *See Mak v. Blodgett*, 970 F.2d 614, 621-22 (9th Cir.1992) (exculpatory nature of the proffered mitigating evidence is an important factor in *Strickland* prejudice analysis.)

Third, the limited opinion of Dr. Crago that Petitioner "was a disturbed young man who suffered from [a] serious, mental illness and often became uncontrollably violent when intoxicated" (Dkt. 137 at 14, 27), was undermined by compelling evidence to the contrary. This evidence included the reports of Drs. LaWall, Gurland, and Boyer that Petitioner did not suffer from a mental defect, other than depression and substance abuse, and understood "the nature, quality and consequences of his actions" at the time of the crime. (Dkt. 63, Exs. TT, WW, VV.) Moreover, none of these experts identified any mental impairment affecting Petitioner's capacity to reason and form intent, and no one believed there was a serious interference with Petitioner's thought processes due to his intake of alcohol on the day of the murder. At the presentence hearing, the prosecution would have undoubtedly presented the reports of Drs. LaWall, Gurland, and Boyer in opposition to Dr. Crago's report if it had been submitted. Thus, the Court agrees with Respondents that the testimony of Dr. Crago would have opened the door to damaging rebuttal testimony, particularly from Dr. Boyer. This factor weighs against a finding of prejudice. *See Strickland*, 466 U.S. at 700 (finding no

prejudice in failure to present evidence because the overwhelming aggravating circumstances outweighed the mitigating circumstances and the proffered evidence would have opened the door to harmful and conflicting evidence); *Campbell v. Kincheloe*, 829 F.2d 1453, 1464 (9th Cir.1987) (finding no IAC where counsel reasonably believed available mitigating evidence would have opened the door to damaging rebuttal evidence).  Because Dr. Crago's testimony had little chance of convincing Judge Veliz to impose a life sentence rather than the death penalty, there is no reasonable probability Petitioner's sentence would have been different but for counsel's failure to introduce Dr. Crago's report.

Fourth, although this is not a case in which the aggravating factors are so overwhelming that there is little likelihood that additional mitigating evidence could have made a difference, *cf. Bonin v. Calderon*, 59 F.3d 815, 836 (9th Cir.1995), Petitioner's counsel presented several statutory and non-statutory mitigating theories to Judge Veliz by way of the nonparticipation mitigation theory.  *Cf. Smith (Bernard) v. Stewart*, 140 F.3d 1263, 1269 (9th Cir. 1998) (counsel presented no evidence at penalty phase).  Specifically, counsel argued that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, as required by A.R.S. § 13-703(G)(1), because he "was significantly impaired at all times prior to and during the instant offenses and, but for that impairment, he surely would not be where he is today." (ROA I at 367.)  Next, counsel argued that Petitioner had satisfied the requirements of A.R.S. § 13-703(G)(3) and (4) because he was most likely "found guilty under the felony murder doctrine, as the State presented no evidence to establish that he actually participated in" the murder and he "could not have reasonably foreseen that by entering this residence he would cause a grave risk of danger to anyone." (*Id.* at 367-68.)  Finally, counsel argued that Petitioner satisfied the requirements of A.R.S. § 13-703(G)(5) because he was twenty-two years old at the time of the offense and was entitled to non-statutory mitigation because of his lack of prior felony convictions.  (*Id.* at 368.)  In addition, counsel argued that the court

could not sentence Petitioner to death under *State v. Tison*, 129 Ariz. 526 (1981), because "there exists no evidence whatsoever that, 'but for' Ben Salazar's brief presence in Ms. Kaplan's home, Davis would not have killed Ms. Kaplan." (*Id.* at 364.) All of these mitigation arguments were supported by evidence presented that was consistent with the nonparticipation theory. Thus, the nonparticipation theory allowed counsel to legitimately proffer four statutory mitigating factors, one non-statutory mitigating factor, and one legal theory as to why Petitioner should not be sentenced to death.

Fifth, Petitioner's contention that the list of lay witnesses who would have confirmed Dr. Crago's opinion that he became extremely violent when intoxicated, and thus would have helped Petitioner receive a life sentence, is nothing more than retrospective speculation. Indeed, as Respondents point out, the strategy that Petitioner now protests was the only sensible course could have equally exposed counsel to an ineffective assistance claim following an unfavorable sentence. More importantly, none of these lay witnesses saw Petitioner in a highly intoxicated state shortly before or after the murder. Thus, even assuming both Dr. Crago and the lay witnesses testified that Petitioner became "dangerously assaultive" when he was intoxicated, those witnesses had no evidence that Petitioner was in fact intoxicated at the time of the crime. The only evidence as to that fact came from Teran, who was "plastered" when he saw Petitioner, and from Petitioner himself, whose credibility would have been damaged if Dr. Crago was questioned about the inconsistencies between Petitioner's trial testimony and his admissions to Dr. Crago. In addition, it is highly unlikely the sentencing judge would have assigned significant mitigating weight to a condition triggered by Petitioner's voluntary ingestion of alcohol and/or drugs. *See Mayfield v. Woodford*, 270 F.3d at 931 n.17. Accordingly, Petitioner has failed to show that a more detailed account of his alleged violent behavior would have raised a reasonable probability that he would have received a life sentence instead of the death penalty. *Strickland*, 466 U.S. at 694.

1      Sixth, Petitioner was not prejudiced by counsel's alleged failure to further investigate

2   and present lay witnesses who could support Dr. Crago's opinion.   Petitioner contends that

3   the witnesses referred to in the PCR investigator's report would have testified to Petitioner's

4   history of violence when intoxicated, his positive relationships with his family members and

5   friends when not under the influence, and his problems with alcohol and drugs.   With the

6   exception of Petitioner's history of violence when intoxicated, however, all of this

7   information was presented in or attached to the presentence report, and referred to in

8   Mauricio's testimony and Petitioner's letter, each of which the sentencing court considered

9   for mitigation purposes.   No prejudice flows from the failure to present such cumulative

10  evidence.   *See Woratzeck v. Stewart*, 97 F.3d 329, 336-37 (9th Cir. 1996) (finding no

11  prejudice from counsel's failure to investigate or call additional witnesses at mitigation phase

12  because all of the information the witnesses would have presented was contained in the

13  sentencing judge's presentence report); *Babbitt v. Calderon*, 151 F.3d 1170, 1175 (9th Cir.

14  1998) (finding no prejudice from failure to call witnesses whose testimony would have been

15  cumulative).   Moreover, the proffered testimony of lay witnesses who supported Dr. Crago's

16  opinion were by no means uniformly helpful to Petitioner because they confirmed violent

17  tendencies at odds with the defense's strategy of portraying Petitioner as a non-participant

18  in the murder.   Indeed, some describe attempted choking incidents that the sentencing judge

19  may well have viewed as similar to the victim's death in this case.

20      Finally, to send this case back to the state trial court to hear the evidence counsel

21  failed to present "would be a looking-glass exercise in folly."   *Gerlaugh*, 129 F.3d at 1036.

22  Here, as in *Gerlaugh*, "[t]he trial and sentencing judge has already considered all of this

23  information in the post-conviction hearing and has held that none of it would have altered

24  his judgment as to the proper penalty for [Petitioner]."   *Id.*   Moreover, "the Arizona Supreme

25  Court looked at the substance and results of the post-conviction proceeding and affirmed the

26  trial judge in all respects. In effect, petitioner has already had what he is asking for –

27

28                                    - 60 -

consideration in a formal hearing of this evidence." *Id.* Accordingly, this Court respectfully declines to order the state courts to do again what has already been done.

In sum, the Court rejects Petitioner's assertion that counsel was constitutionally ineffective for emphasizing Petitioner's non-participatory role and lack of *Enmund/Tison* culpability over his alleged impaired capacity as mitigation. Counsel acted reasonably in continuing the nonparticipation defense at the penalty phase and not introducing psychological and intoxication evidence as mitigation because that evidence suggested violent tendencies and would have undermined the defense strategy of portraying Petitioner as a non-participant in the murder. Moreover, even assuming counsel performed deficiently, Petitioner has failed to demonstrate prejudice under *Strickland.* Petitioner is not entitled to relief on Claims A-21 and A-22.

**F.    Claim A-23**

At the presentence hearing, the prosecution asked that evidence admitted at Davis's trial be considered for purposes of determining aggravating factors as to Petitioner. Although defense counsel did not object to this request, the court never ruled on it. (RT 1/14/88 at 3-4.) In Claim A-23, Petitioner contends his attorneys provided ineffective assistance of counsel by failing to object to the prosecution's request. The Court disagrees.

Regardless of whether defense counsel erred by failing to object to the prosecution's request, Petitioner has not demonstrated prejudice because there is no proof that the court relied on evidence presented at Davis's trial for purposes of sentencing Petitioner. As a result, this Court must assume that the trial court properly applied the law by considering only the evidence admitted at Petitioner's trial. Because the fairness of the sentencing proceeding could not have been adversely affected by the court's consideration of only admissible evidence, any error by defense counsel in failing to object to the prosecution's request could not have prejudiced Petitioner.

When determining the existence of aggravating factors for purposes of sentencing a

1   death-eligible defendant, an Arizona trial judge may consider only evidence introduced at

2   the trial or at the presentence hearing of the defendant being sentenced. A.R.S. § 13-703(C);

3   *Gardner v. Florida*, 430 U.S. 349, 362 (1977). In a habeas proceeding, the petitioner bears

4   the burden of proving that the judge considered improper evidence. *McKenzie v.*

5   *McCormick*, 27 F.3d 1415, 1418-20 (9th Cir. 1994). Thus, in the absence of evidence, this

6   Court may not presume that Judge Veliz failed to follow Arizona law and sentenced

7   Petitioner to death on the basis of evidence introduced at Davis's trial.

8       Claim A-23 was previously rejected by the state courts. At the PCR proceeding,

9   Judge Veliz found that counsel's failure to object to the Davis evidence did not prejudice

10  Petitioner at sentencing because "[t]his Court did not consciously use any evidence from the

11  Davis case against [Petitioner]." (ROA II at 223.)  The Arizona Supreme Court agreed:

12          Defendant next contends that trial counsel was deficient for permitting
    the trial court to consider evidence from a pretrial hearing in co-defendant
13          Davis's case. The problem with this argument is that the Davis pretrial
    hearing evidence was *not* considered by the trial court, a fact specifically
14          found by the trial court in the Rule 32 proceedings.

15  *Salazar*, 173 Ariz. at 416, 844 P.2d at 583 (emphasis in original). The Arizona Supreme

16  Court's finding that Judge Veliz did not consider evidence from Davis's case in sentencing

17  Petitioner to death is entitled to a presumption of correctness. Thus, this Court must treat that

18  finding as accurate "unless one of the circumstances listed in section 2254(d)(1) to (7) exists,

19  unless the [state court] determination is not fairly supported by the state court record, or

20  unless [Petitioner] shows by convincing evidence that the factual determination by the state

21  court is erroneous." *Derrick*, 924 F.2d at 823-24 (citation omitted).

22      Petitioner contends the state court's factual finding is not fairly supported by the

23  record because "Judge Veliz made a finding at the time of sentencing that Mr. Salazar knew

24  the victim and knew that the house was occupied when he entered it that night." (Dkt. 137

25  at 30-31.)  Judge Veliz must have relied on evidence from Davis's case for this finding,

26  Petitioner asserts, because "no such evidence, or inferences thereof, were presented at Mr.

27

28                           - 62 -

1    Salazar's trial or sentencing." (*Id.* at 31.)   The Court disagrees.

2        Evidence from which the sentencing judge could have inferred that Petitioner knew

3    the house was occupied by "a frail, elderly woman" was presented at both the guilt and

4    penalty phases of Petitioner's trial.  The prosecution presented evidence that the victim was

5    a distinctive-looking woman who "stood out because she wore a patch on her eye and was

6    an elderly lady." (RT 12/4/87 at 43; RT 1/14/88 at 19.)  The prosecution theorized that

7    Petitioner knew the house was occupied because the victim was "a fixture in the area" who

8    people often saw walking around the neighborhood. (RT 12/11/87 at 153.)  The prosecution

9    argued that Petitioner knew the house was occupied when he entered based on the testimony

10   of police officers that the victim's television set was blaring when they found her body.

11   Petitioner testified that he lived his entire life close to the neighborhood in which the victim's

12   house was located and had driven up and down her street before, but denied knowing the

13   victim and seeing her in the area. (RT 12/10/87 at 153-54, 159.)  Petitioner denied that the

14   television was on when he entered the victim's house and suggested instead that Davis turned

15   the set on before or after killing the victim.  Based on the prosecution's evidence that the

16   victim was distinctive looking and Petitioner's admission that he had spent his whole life in

17   the same neighborhood as the victim and had driven her street many times, the trial court

18   could have reasonably found that Petitioner knew who the victim was and where she lived.

19   Similarly, relying on the prosecution's evidence and rejecting Petitioner's testimony, the

20   court could have reasonably concluded that Petitioner knew the house was occupied because

21   the television was blaring when he and Davis entered the house.

22       In addition to Petitioner's testimony, Davis's mother had previously testified that the

23   Davis family personally knew the victim.  Defense counsel sought to admit Davis's mother's

24   testimony in order to demonstrate that, in contrast to Petitioner, Davis knew the victim and

25   thus had motive to burglarize her home. (RT 12/10/87 at 4-6.)  Petitioner testified, and his

26   mother confirmed, that he and Davis had been friends for a long time, he sometimes lived

27

28                                    - 63 -

1  with the Davis family, and he spent a significant amount of time with Davis's mother. (RT

2  12/10/87 at 102-03; RT 1/14/88 at 19.)   Based on this evidence, Judge Veliz reasonably

3  could have determined that, when Davis asked Petitioner to "check out" the house, he also

4  told Petitioner who lived there, or that Petitioner knew who the victim was and where she

5  lived from his conversations with Davis's mother. (RT 12/10/87 at 110-11.)

6       The record supports the state court's finding that no evidence from Davis's trial was

7  considered by Judge Veliz when he determined Petitioner's sentence. Indeed, there is no

8  reason to believe that Judge Veliz was influenced or otherwise diverted from his task by

9  evidence presented during Davis's trial, and, at the PCR hearing, the judge confirmed that

10  he did not consider such information. (ROA II at 223.) In the absence of any evidence to

11  the contrary, the Court must assume that Judge Veliz properly adhered to the law and, at

12  sentencing, considered only the evidence introduced by Petitioner. *See Walton v. Arizona*,

13  497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584

14  (2002); *Gretzler v. Stewart*, 112 F.3d 992, 1003, 1009 (9th Cir. 1997). Because Petitioner

15  has not shown that the trial court considered evidence presented at Davis's trial in sentencing

16  him to death, he cannot establish prejudice from counsel's failure to object to the

17  prosecutor's request that evidence from Davis's trial be considered at Petitioner's sentencing.

18       **G.    Claim A-26**

19       In Claim A-26, Petitioner contends he was denied effective assistance of counsel

20  because his attorneys failed to adequately screen and prepare his brother Mauricio to testify

21  at the presentence hearing. Therefore, Petitioner argues, his attorneys were responsible for

22  Mauricio's harmful admission that he had seen Petitioner become aggressive and violent

23  when Petitioner was intoxicated.

24       Relief on this claim was previously denied by the Arizona Supreme Court, which

25  specifically found that Petitioner's "brother was interviewed by counsel and his comment at

26  sentencing was unexpected." *Salazar*, 173 Ariz. at 416, 844 P.2d at 583. In addition, the

27

28                                           - 64 -

1   Arizona Supreme Court found that "[c]ounsel ameliorated the brother's testimony by

2   bringing out that [Petitioner's] violence was usually in response to provocation."  *Id.*

3   Although it is not bound by its findings, this Court agrees with the Arizona Supreme Court.

4         At the PCR hearing, Hurd testified that, during an interview before the presentence

5   hearing, Mauricio indicated that he would testify that "when [Petitioner] became intoxicated

6   he would become mellow and introverted and like to keep to himself."  (RT 3/9/90 at 150.)

7   This testimony was consistent with the theory the defense was trying to present, that

8   Petitioner was "a nonviolent individual."  (*Id.*  at 150.)  Based on Mauricio's comments

9   during the interview, Hurd was surprised when he testified that he had seen Petitioner

10  become aggressive or unreasonable when he was intoxicated by "some heavy type alcohol,"

11  like tequila. (RT 1/14/88 at 28; RT 3/9/90 at 150.)  In an effort to minimize the effect of this

12  testimony, Hurd got Mauricio to qualify his broad statement.   Thus, the net sum of

13  Mauricio's testimony was that, although he had seen Petitioner become violent and

14  "explode" when he was using hard liquor, this was usually in response to provocation;

15  "[m]ost of the time he would become quiet" and withdrawn.  (RT 1/14/88 at 28, 30-31.)

16        Mauricio's testimony was important to Petitioner, as it directly supported the

17  mitigation theory that Petitioner was not a violent person and thus did not participate in the

18  murder.  Despite its significance, however, Mauricio's testimony was very straightforward.

19  In only three pages of direct examination, defense counsel elicited all of the key information

20  Mauricio was able to offer.  Accordingly, further preparation would not have affected

21  Petitioner's mitigation theory or Mauricio's testimony.   Moreover, it was not within

22  counsel's control to prevent Mauricio from admitting that, on certain occasions, he had seen

23  Petitioner become violent when intoxicated, or to predict such testimony and therefore refrain

24  from calling Mauricio as a witness.  In short, there is no evidence that counsel's performance

25  was deficient other than the fact that Mauricio did not perform as well as anticipated when

26  questioned by the court.

27

28                                    - 65 -

1   Moreover, counsel clearly minimized any detriment from Mauricio's broad admission

2   by getting him to qualify his testimony and clarify that, although he had seen Petitioner

3   become violent when using hard liquor, typically Petitioner would become quiet and

4   withdrawn unless provoked.  (RT 1/14/88 at 28, 30-31.)  Accordingly, Petitioner could not

5   have been prejudiced by Mauricio's testimony in any event.

6   **II.    Claim D-4: Lack of Prosecution Standards in Seeking Death Penalty**

7   Petitioner contends the Arizona capital punishment statute is arbitrarily and

8   capriciously imposed in violation of the Constitution because "there are no legislatively

9   enacted guidelines to channel a prosecutor's discretion in determining when to seek the death

10  penalty in Arizona."  (Dkt. 113 at 9; Dkt. 114 at 52-55.)

11  In *Bernard Smith v. Stewart,* the Ninth Circuit disposed of the argument that Arizona's

12  death penalty statute is constitutionally infirm because "the prosecutor can decide whether

13  to seek the death penalty." 140 F.3d at 1272; *see also Gregg v. Georgia,* 428 U.S. 153, 199

14  (1976) (pre-sentencing decisions by actors in the criminal justice system that may remove

15  an accused from consideration for the death penalty are not unconstitutional); *Silagy v.*

16  *Peters,* 905 F.2d 986, 993 (7th Cir.1990) (holding that the decision to seek the death penalty

17  is made by a separate branch of the government and is therefore not a cognizable federal

18  issue).  Accordingly, relief on Claim D-4 is denied.

19  **III.   Claim D-6: Lack of Proportionality Review**

20  Petitioner contends that he is entitled to federal habeas relief because during his direct

21  appeal, "for the first time, the Arizona Supreme Court held that they would no longer

22  perform proportionality reviews" "even though . . . the trial courts in Arizona did not have

23  to perform proportionality reviews."  (Dkt. 137 at 40.)  The Court disagrees.

24  The Supreme Court and the Ninth Circuit have each held that there is no constitutional

25  requirement of proportionality review in capital punishment cases.  *See Pulley v. Harris*, 465

26  U.S. 37, 48-51 (1984); *Ceja v. Stewart*, 97 F.3d 1246, 1252 (9th Cir. 1996.)  In *Pulley*, the

27

28                                              - 66 -

1   Supreme Court reaffirmed its conclusion in *Jurek v. Texas*, 428 U.S. 262, 273-74 (1976), that

2   the Texas capital sentencing scheme eliminated any necessity for state comparative

3   proportionality review because the scheme required at least one of five aggravating

4   circumstances to be found, and any evidence of mitigating circumstances to be considered,

5   before a death sentence could be imposed. *See* 465 U.S. at 48-49.  In *Ceja*, the Ninth Circuit

6   likewise rejected a challenge to the Arizona Supreme Court's abandonment of the

7   proportionality review process, noting that the trial court's application of an adequately

8   narrowed aggravating circumstance ensured that the petitioner's substantive right to be free

9   from disproportionate sentencing was not violated.  97 F.3d at 1252.

10        In *Walton v. Arizona*, 497 U.S. at 655-56, the Supreme Court held that where the

11   statutorily defined aggravating factor had been construed in a manner that furnished

12   sufficient guidance to the sentencer, proportionality review was not constitutionally required.

13   In such a case, the Court can lawfully presume that the death sentence in question was not

14   "wantonly and freakishly imposed" and, therefore, the sentence was not disproportionate

15   within any recognized meaning of the Eighth Amendment.  *See also Zant v. Stephens*, 462

16   U.S. 862, 876-77 (1983) (statutorily defined aggravating factors sufficient to satisfy the

17   narrowing requirement); *McCleskey v. Kemp*, 481 U.S. at 279 (recognizing that when

18   statutory procedures adequately channel the sentencer's discretion, proportionality review

19   is not constitutionally required.)

20        In the present case, the trial court's application of an adequately defined and narrowed

21   aggravating circumstance ensured that Petitioner's right to be free from a disproportionate

22   sentence was not violated.  Indeed, Petitioner has never claimed that the "heinous, cruel or

23   depraved" factor was applied to him in an arbitrary manner.  *Cf. Walton*, 497 U.S. at 656.

24   Thus, the fact that neither the trial court nor the state supreme court conducted a

25   proportionality review does not violate the Eighth Amendment's prohibition against the death

26   penalty being imposed in an arbitrary or capricious manner.

27

28                                      - 67 -

1    **IV.    Claim E: Lack of Jury Findings on Aggravating Factors**

2         Petitioner alleges that he was entitled to a jury determination on the aggravating

3    factors that rendered him eligible for a death sentence.  (Dkt. 137 at 43.)  In *Ring v. Arizona*,

4    the Supreme Court ruled that Arizona's aggravating factors are an element of the offense of

5    capital murder and must be found by a jury.  536 U.S. at 584.  However, in *Schriro v.*

6    *Summerlin*, 542 U.S. 348 (2004), the Supreme Court held that *Ring* does not apply

7    retroactively to cases already final on direct review.  Because Petitioner's direct review was

8    final prior to *Ring*, he is not entitled to relief premised on that ruling.

9                                         **CONCLUSION**

10        For the reasons set forth above, Petitioner is not entitled to habeas relief.  The Court

11   further finds that an evidentiary hearing in this matter is neither warranted nor required.

12                              **CERTIFICATE OF APPEALABILITY**

13        Rule 22(b) of the Federal Rules of Appellate Procedure provides that when an appeal

14   is taken by a petitioner, the district judge who rendered the judgment "shall" either issue a

15   certificate of appealability ("COA") or state the reasons why such a certificate should not

16   issue.  Therefore, in the event that Petitioner appeals, this Court on its own initiative has

17   evaluated the claims within the petition for suitability for the issuance of a COA.  *See* 28

18   U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

19        Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has

20   made a substantial showing of the denial of a constitutional right."  With respect to claims

21   rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the

22   district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

23   *McDaniel*, 529 U.S. 473, 484 (2000).  For procedural rulings, a COA will issue only if

24   reasonable jurists could debate whether the petition states a valid claim of the denial of a

25   constitutional right and whether the court's procedural ruling was correct.  *Id.*

26        The Court finds that reasonable jurists could debate its resolution of the following

27

28                                          - 68 -

issues:

> Whether counsel's representation at trial was ineffective for failing to conduct a reasonable investigation and make informed strategic decisions regarding trial defenses (Claim A-1);

> Whether counsel's representation at sentencing was ineffective for continuing the nonparticipation defense and not investigating and presenting available psychological and intoxication evidence (Claims A-21 & A-22) .

Therefore, the Court issues a COA as to these issues.  For the remaining claims and procedural issues, the Court declines to issue a COA for the reasons set forth in its March 31, 2000 order (Dkt. 121), July 16, 2005 order (Dkt. 169), and the instant order.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Petition for Writ of Habeas Corpus and all amendments thereto (Dkts. 1, 62, 113) are **DENIED WITH PREJUDICE**.  The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered by this Court on February 2, 1996, is **VACATED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

> 1.   Whether counsel's representation at trial was ineffective for failing to conduct a reasonable investigation and make informed strategic decisions regarding trial defenses (Claim A-1);

> 2.   Whether counsel's representation at sentencing was ineffective for continuing the nonparticipation defense and not investigating and presenting available psychological and intoxication evidence (Claims A-21 & A-22) .

**IT IS FURTHER ORDERED** that the Clerk of Court forward a copy of this Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

DATED this 15th day of September, 2008.

**Copies To Rachelle Resnick**

**9/15/08 mm**

FRANK R. ZAPATA
United States District Judge