**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Alfonso Raymond Salazar, | No. CV-96-00085-TUC-FRZ |
| Petitioner, | <u>DEATH PENALTY CASE</u> |
| v. | **ORDER** |
| Charles Ryan, et al., | |
| Respondents. | |

This matter is before the Court on limited remand from the Ninth Circuit Court of Appeals. (*See* Doc. 195.)[1] The court of appeals has ordered this Court to reconsider, in the light of intervening law, including *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), two procedurally defaulted claims alleging ineffective assistance of counsel at sentencing: that counsel (1) failed to investigate and prepare a social history ("Claim A-24"), and (2) failed to provide background information to Petitioner's mental health experts ("Claim A-27").[2]

This Court ordered supplemental briefing to address whether cause exists under *Martinez* to excuse the procedural default of Claims A-24 and A-27, and whether Petitioner is entitled to habeas relief under 28 U.S.C. § 2254 on the claims. (Doc. 197.)

---

[1] "Doc." refers to numbered documents in this Court's case file (prior to August 2005) and this Court's electronic case docket (beginning August 2005).

[2] In its March 2000 order identifying the procedural status of Petitioner's claims, the Court designated the ineffective assistance allegations as Claims A-1 through A-35. (Doc. 121.) At issue for purposes of this remand are Claims A-24 and A-27. For consistency, the Court will continue to refer to the claims as such.

1    The Court also ordered Petitioner to include any requests for evidentiary development

2    with the supplemental briefing. (*Id.*)

3            Petitioner filed a supplemental brief addressing the applicability of *Martinez* to

4    Claims A-24 and A-27, arguing that post-conviction counsel acted ineffectively in

5    litigating claims against sentencing counsel in state court, and requesting evidentiary

6    development and an evidentiary hearing on the procedural default of these claims. (Doc.

7    200.) Respondents filed a response, and Petitioner filed a reply. (Docs. 212, 217.)

8            Claims A-24 and A-27 as alleged in the supplemental briefing, however, appear to

9    be factually distinct from the claims Petitioner alleged in his second amended petition. In

10   his second amended petition, Petitioner asserted ineffectiveness of counsel based on a

11   general allegation of a failure to conduct an investigation into Petitioner's background,

12   and failing to present that information to his mental health expert. (Doc. 114 at 24-25.)

13   Petitioner is now asserting very specific allegations of severe family dysfunction and

14   neuropsychological impairments that have never before been alleged in this Court.

15   (*Compare* Doc. 114 at 24-25 *with* Doc. 200.) Because it is not clear that the IAC claims

16   as alleged in Petitioner's supplemental brief are properly before the Court for purposes of

17   addressing the merits of Petitioner's underlying IAC claims, the Court finds that further

18   briefing on this issue is necessary.

19                              **PROCEDURAL HISTORY**

20           On July 25, 1986, Sara Kaplan, a frail 83-year old woman who lived alone, was

21   beaten and strangled in her home. Petitioner and a co-defendant, Michael Wayne Davis,

22   were charged and tried separately on one count each of burglary, kidnaping, and first

23   degree murder. Petitioner was represented at trial and sentencing by court-appointed

24   counsel William Redondo and Patrick Hurd. A jury convicted Petitioner of all counts on

25   December 14, 1987, and Pima County Superior Court Judge Gilbert Veliz sentenced him

26   to death for the murder and to concurrent terms for the burglary and kidnapping.[3]

27

28           [3] On September 23, 1987, Davis was also convicted on all counts, and sentenced
     to death for the murder. Following a successful petition for post-conviction relief based
     on counsel's ineffectiveness for changing defenses mid-trial, Davis was retried and

Petitioner filed an appeal with the Arizona Supreme Court. (APP-DR at item No. 1.)[4] Attorney Fred Dardis was appointed to represent Petitioner in his direct appeal. (ROA I at 419.) Dardis also represented Petitioner in his petition for post-conviction relief ("PCR") proceedings, under Rule 32, Arizona Rules of Criminal Procedure ("Rule 32"). On September 21, 1988, while the appeal was pending, Dardis filed a preliminary PCR petition with the trial court. (ROA II at 266–313.)

The Arizona Supreme Court stayed the appeal pending resolution of the Rule 32 proceedings. (APP-DR at item No. 13.) The trial court granted Petitioner's motion for an evidentiary hearing on several issues raised in his PCR, including claims of ineffective assistance of counsel ("IAC") at trial and at sentencing, and granted Petitioner's request for an investigator. (ROA II at 495–97.) Following an evidentiary hearing, oral argument, and additional briefing on the PCR petition, the trial court denied relief. (ROA II at 221–24.) Petitioner filed a petition for review of the Rule 32 proceedings. (ROA II at 257.) The Arizona Supreme Court consolidated the petition with the reinstated appeal and treated the consolidated matters as a single appeal. (APP-DR at item No. 41.) As a result, the court struck the substantive portion of Petitioner's petition for review and directed Petitioner to include Rule 32 arguments in the appellate opening brief. (APP-DR at item No. 37.) On December 17, 1992, the Arizona Supreme Court affirmed Petitioner's convictions and sentences and denied his PCR-related claims. *See State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992), *cert. denied*, 509 U.S. 912 (1993).

---

sentenced to life imprisonment.

[4] The pertinent parts of the state court record consist of the trial and post-conviction reporter's transcripts ("RT"); a four-volume Record on Appeal ("ROA I"), containing a consecutively numbered set of pleadings and minute entries prepared by the Clerk of the Pima County Superior Court for the direct appeal (filed May 23, 1988); a five-volume Record on Appeal ("ROA II") prepared for the petitioner for review of the first Rule 32 petition (two volumes filed June 7, 1991, and three supplemental volumes filed Dec. 26, 1991); a two-volume Record on Appeal ("ROA III") prepared for the petition for review of the second Rule 32 petition (one volume filed on August 10, 1995, and one supplemental volume filed August 14, 1995); and certified copies of the Arizona Supreme Court's docket in Petitioner's direct appeal in case number CR-88-135-AP/PC ("APP-DR") and petition for review from the denial of relief in Petitioner's second petition for post-conviction relief in case number CR-95-0373-PC ("APP-PC").

1    Petitioner filed a second PCR petition in June, 1994. The PCR court summarily

2    denied relief, finding the claims precluded. (ROA III at 1.) On November 22, 1995, the

3    Arizona Supreme Court denied a petition for review of the PCR court's ruling. (APP-PC

4    at item No. 3.)

5    Petitioner filed a preliminary Petition for Writ of Habeas Corpus in this Court on

6    February 5, 1996, and an amended petition on December 19, 1997. (Docs. 1, 62.) A

7    second amended petition was filed on July 30, 1999. (Doc. 113.) The Court initially

8    dismissed several claims as procedurally barred, including the claims at issue in this

9    order: Claims A-24 and A-27. (Doc. 121.) The Court subsequently denied the remainder

10   of Petitioner's claims in two orders addressing the conviction- and sentencing-related

11   claims separately. (Docs. 169, 177.)

12   While Petitioner's appeal from this Court's denial of habeas relief was pending,

13   the Supreme Court decided *Martinez v. Ryan*, holding that where IAC claims must be

14   raised in an initial PCR proceeding, failure of counsel in that proceeding to raise a

15   substantial trial IAC claim may provide cause to excuse the procedural default of that

16   claim. 132 S. Ct. at 1320. Subsequently, Petitioner moved the Ninth Circuit to stay his

17   appeal and grant a limited remand in light of *Martinez*. The Ninth Circuit granted the

18   motion and remanded for consideration of Claims A-24 and A-27 in light of intervening

19   law, stating that the "remanded claims are for purposes of remand substantial." (Doc.

20   195) (citing *Martinez*, 132 S.Ct. 1309; *Trevino v. Thaler*, 133 S. Ct. 1911 (2013); *Detrich*

21   *v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc); *Dickens v. Ryan*, 740 F.3d 1302 (9th

22   Cir. 2014) (en banc)).

23   In August 2015, the parties completed supplemental briefing in this Court.

24                                   **DISCUSSION**

25   Petitioner seeks reconsideration based on *Martinez* for two claims alleging counsel

26   ineffectiveness for failing to investigate and prepare a social history of Petitioner for

27   sentencing (Claim A-24), and failing to provide information concerning Petitioner's

28   background to mental health experts (Claim A-27). The Court previously found these

claims to be procedurally defaulted because Petitioner failed to present them in state court and no remedies remained available to exhaust the claims. (Doc. 121 at 18, 33.)

To excuse the default of Claims A-24 and A-27, Petitioner argues there is a reasonable probability that post-conviction relief would have been granted, and Petitioner would have received a life sentence, had PCR counsel adequately presented his IAC at sentencing claims by conducting an investigation into Petitioner's social history, presenting that history to a mental health expert, and providing the resulting mitigating evidence to the PCR court to establish prejudice as a result of trial counsel's failures at sentencing. (Doc. 200 at 20-21, n.4.)

Respondents assert that Petitioner's supplemental brief is beyond the scope of this remand, that Petitioner has not shown that PCR counsel was ineffective in failing to raise Claims A-24 and 27 in state court, and that Petitioner is not entitled to relief on the merits of the claims. After due consideration, the Court finds that Petitioner's claims and supplemental briefing do not fall outside the scope of remand, but that further briefing is necessary before the Court determines if these claims are properly before the Court, and, if so, whether Petitioner can establish cause to excuse the procedural default of the substantial claims.

## I.     Applicable Law

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, habeas review of a defaulted claim is barred unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Ordinarily, "cause" to excuse a default exists if a petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Id.* at 753. In *Coleman*, the Court held that ineffective assistance of counsel in post-conviction proceedings does not establish cause for the procedural default of a claim. *Id.*

In *Martinez*, however, the Court established a "narrow exception" to the rule announced in *Coleman*. The Court explained:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

132 S. Ct. at 1320; *see also Trevino*, 133 S. Ct. at 1918 (noting that *Martinez* may apply to a procedurally defaulted trial-phase ineffective assistance of counsel claim if "the claim . . . was a 'substantial' claim [and] the 'cause' consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral review proceeding" (quoting *Martinez,* 132 S. Ct. at 1320)).

Accordingly, under *Martinez*, a petitioner may establish cause for the procedural default of an ineffective assistance claim, "where the state (like Arizona) required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 . . . (1984),' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 132 S. Ct. at 1318); *see Clabourne v. Ryan*, 745 F.3d 362, 377 (9th Cir. 2014) *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798, at 818-19 (9th Cir. 2015); *Dickens*, 740 F.3d at 1319–20; *Detrich*, 740 F.3d at 1245.

Respondents argue *Martinez* does not apply to excuse Petitioner's procedural default of these claims because, at the time of Petitioner's appeal, state law allowed Petitioner to raise his IAC claims on direct appeal. Petitioner responds that this argument misrepresents the actual procedure in place at the time of Petitioner's PCR proceeding and that *Martinez* does not hinge on whether Petitioner's IAC claims, brought first in a collateral proceeding, are later consolidated for review with the direct appeal. After the

parties completed supplemental briefing, the Ninth Circuit issued its decision in *Runningeagle v. Ryan*, No. 07-99026, 2016 WL 3213095 (9th Cir. June 10, 2016), finding *Martinez* applicable to habeas petitioners who were required, by virtue of Arizona's procedural system in place during the relevant period, to assert their IAC claims in the initial-review collateral proceeding.[5] *Id.* at *9. Petitioner was similarly situated to Runningeagle, and brought his appeal during the same relevant period as Runningeagle. Thus, it would seem that, under *Runningeagle*, the Court should apply *Martinez* to determine whether Petitioner can demonstrate cause and prejudice to excuse the procedural default of Claims A-24 and A-27. However, because Petitioner has requested that the parties be allowed to brief the impact of the decision in *Runningeagle* (*see* Doc. 220) the Court will permit the parties to do so in conjunction with the supplemental briefing ordered below before the Court makes a determination as to the applicability of *Martinez* to Petitioner's claims.

## II.   Relevant Facts

Petitioner's IAC claims relate to claims which this Court has previously resolved on the merits. Therefore, some of the factual background set forth herein repeats what has previously been set out in the Court's July and September 2005 orders addressing Petitioner's IAC claims during both the guilt- and penalty-phases of trial.

*State Court Proceedings*[6]

_____

[5] The Court in *Runningeagle* expressed no opinion as to whether, before the Arizona Supreme Court decided *State v. Valdez*, 160 Ariz. 9, 770 P.2d 313 (Ariz. 1989) and *State v. Carver*, 160 Ariz. 167, 771 P.2d 1382 (Ariz. 1989), Arizona law effectively required petitioners to bring IAC claims in initial-review collateral proceedings. *See Runningeagle*, 2016 WL 3213095, *9, n.12 (citing *Cf. Lambright v. Stewart*, 241 F.3d 1201, 1203 (9th Cir. 2001) (stating that, as of 1984, no Arizona case required IAC claims to be brought on direct appeal)). Respondents acknowledge, however, that the procedure in *Valdez* was controlling law at the time of Petitioner's direct appeal and that Petitioner followed that procedure. (*See* Doc. 212 at 8.)

[6] Because the procedural and factual background of Petitioner's state court proceedings has been extensively summarized by this Court in prior decisions, (*see* Docs. 121, 133, 169, and 177), the Court reiterates now only the facts which are salient to the discussion of the remanded claims. This includes some of the procedural and factual summary regarding other sentencing-related IAC claims, specifically Claims A-21 and A-22, and this Court's ruling on the merits of those claims.

The following events, as described by the Arizona Supreme Court, led to Petitioner's prosecution and conviction:

> The victim in this murder case is a fragile, 83-year-old woman, 5 feet tall, 89 pounds, who wore a patch over a sightless eye and lived alone. On the night of July 25, 1986, she was murdered in her home by beating and strangulation. The murderers gained forced entry to her home by prying metal security bars from a window.
>
> On the day of the murder, defendant Salazar earned some money doing odd jobs. He and his co-defendant, Michael Wayne Davis, then used the money to buy tequila and gin which they consumed during the course of the day. Around midnight, they attended a party at the home of James Teran, who provided them with some beer. On their way back to Davis' house, where they both lived, they broke into the victim's home by prying wrought iron bars from a window. Later that same evening, Davis' aunt, Maria Snyder, noticed that defendant, who was not wearing a shirt, had scratch marks on his chest. The day after the murder, concerned relatives of the victim asked police to check on her. The police found her body on top of an overturned table. Her TV set was still blaring. She had been severely beaten and had also been strangled with a telephone cord. Palm prints, fingerprints and footprints were found in and around the house and on the wrought iron bars that had been pried from the window.
>
> Approximately 2 months later, defendant was arrested. While his story was to change at trial, he initially denied ever being in the victim's house.

*Salazar*, 173 Ariz. at 403–04, 844 P.2d at 570–71.

*Pretrial Mental Health Evaluations*

Prior to trial, Petitioner was evaluated by two psychiatrists and one psychologist. John LaWall, M.D., a neurologist-psychiatrist, examined Petitioner after the court granted Petitioner's request to evaluate his "mental condition at the time of the crime charged and his competence to stand trial," pursuant to Rule 11.2 of the Arizona Rules of Criminal Procedure ("Rule 11"). (ROA I at 48, 51.) Dr. LaWall interviewed Petitioner and reviewed records consisting of transcripts of statements from Petitioner, witnesses, and his co-defendant, and police reports. Dr. LaWall was unable to diagnose Petitioner with any mental illness, and concluded that there was no evidence to suggest he did not

understand the nature, quality, and consequence of his actions at the time of the alleged offense. (Doc. 63, Ex. WW.)

Psychiatrist David Gurland, M.D., conducted a second Rule 11 evaluation of Petitioner. (Doc. 63, Ex. VV.) Dr. Gurland opined that Petitioner, who denied murdering the victim, was of at least average intelligence, with no evidence of bizarre or inappropriate behaviors. (*Id*.) Though he appeared to have been mildly to moderately intoxicated at the time of the offense, he "was certainly aware of the nature and quality of his acts and knew right from wrong at that time." (*Id*.)

In September 1987, defense counsel retained psychologist and biofeedback practitioner Robert Crago, Ph.D., to conduct psychological testing of Petitioner, develop a personality history, and determine the existence of any neuropsychological disorders. (ROA I at 100, 109-10.) Defense counsel requested information about Petitioner's "mental state, personality organization and cognitive functioning." (Doc. 200-1, Ex. 3.)

Dr. Crago spent two days evaluating Petitioner. (Doc. 200-1, Ex. 3 at 1.) Petitioner told Dr. Crago that he began smoking marijuana at approximately nine years of age and "enjoyed hallucinating." (*Id*.) He progressed from smoking marijuana to "mushrooms and acid," amphetamines, downers, cocaine, and alcohol. (*Id*. at 2.) Petitioner also said that, in addition to drinking alcohol, he had shot "two riggs" of cocaine intravenously on the day of the murder. (*Id*. at 1.)

Diagnosing Petitioner with Substance Abuse, currently in remission, Dr. Crago concluded that Petitioner historically functioned as a drug addict, who most frequently abused alcohol, cocaine, and LSD. (*Id*. at 5.) Based on standardized testing, Dr. Crago found Petitioner's intelligence to be "in the average range" and his cognitive functioning affected only by educational deficits, not any significant anxiety, pathological thought patterns, or residual brain damage. (*Id*. at 3.)

In terms of personality functioning, however, Dr. Crago determined that Petitioner was "quite immature" and "moderately to severely disturbed." (Doc. 200-1, Ex. 3 at 1.) "Although not floridly or overtly psychotic or schizophrenic, his thinking and reality

testing showed definite evidence of a thought disorder including hallucinations and paranoid trends. He might best be characterized as a functioning or borderline schizophrenic." (*Id.* at 4.) Dr. Crago concluded that Petitioner presented as suffering from Mixed Personality Disorder, with schizotypal, borderline, paranoid, antisocial and avoidant features." (*Id.* at 5.) On the basis of his immaturity and thought disorder, Dr. Crago further opined that Petitioner was "quite reactive to his environment," a condition which might manifest itself in "releasing aggressive or hostile impulses." (*Id.* at 4.) According to Dr. Crago, the expression of anger in persons with Petitioner's personality profile "tends to come in acute outbursts and it may involve dangerously assaultive behavior." (*Id.*)

With regard to the offense, Petitioner denied murdering the victim, but admitted entering the house to commit burglary. Petitioner denied knowing the house was occupied and indicated that he became afraid and left "when he felt a cold hand grasp his wrist and saw something white which he felt was a 'ghost.'" (*Id.* at 1.) Because Petitioner denied participating in the murder, Dr. Crago determined it was "impossible to accurately assess his sanity" and "whether he knew right from wrong" at the time of the crime. *(Id.* at 5-6.) Dr. Crago concluded, however, that if Petitioner had in fact committed the murder, "it is highly possible" "he was insane or irrational at the time" because "extreme alcohol intoxication and especially cocaine intoxication often precipitate psychotic behavior even in individuals who are much less disturbed" than Petitioner. (*Id.* at 6.)

*Trial*

Because the physical evidence undisputely established Petitioner's presence inside the bedroom, the defense aimed to establish that Petitioner left the house before Davis killed the victim (the "nonparticipation theory"), to attack the prosecution's charge that Petitioner was "actively and intimately involved in" the murder. Counsel sought to prove that Petitioner entered the house out of curiosity and under the mistaken belief that it was vacant, but terminated his involvement by fleeing the premises minutes after he entered and realized his error.  (RT 12/3/87 at 158, 166; RT 3/9/90 at 124.)

At trial, defendant claimed that he and Davis entered the victim's home on a whim, out of curiosity, and that they believed the home was unoccupied. After Davis pried the metal bars from the window and they entered, defendant said he used a pocket lighter to guide himself through the home which, he said, was dusty, full of junk and completely silent. While "looking" in a file drawer, something that he thought was a ghost touched his arm and he fled the house in terror. After that, he said, Davis caught up with him outside and admitted that he had just killed someone in the house. Though defendant claimed not to have believed Davis at the time, he nevertheless removed and discarded his shoes at that point because he knew that his footprints were all over the victim's home. He then fled barefoot across desert terrain. The following day, he said he moved out of the Davis household after learning from TV news that there really had been a murder.

The state's version of defendant's role the night of the murder was considerably different than defendant's and was based, in large part, on physical evidence. A fingerprint examiner established that defendant's prints were found on the window grating that had been pried loose, on a telephone book inside the point-of-entry window, and on three file cabinets in the murder room. An identification technician testified concerning the bloody handprints found on one of the three file cabinets.

An expert tracker testified that zig-zag pattern shoeprints were found both under the body and partially on the body. These prints were made by a Tiger brand running shoe, which defendant admitted owning. Because the shoe prints were both under and on top of the body, they show that the shoe wearer was present both before and after the murder.

The medical examiner established that blood spatter patterns showed that the victim was beaten while on her bed and that she was still alive when she was dragged to the floor. Ultimately, she died atop an overturned table. The victim had defensive wounds on her arms and hands, and was beaten so severely that her nose was broken. She was strangled so fiercely that her Adam's apple was crushed.

The jury, obviously rejecting defendant's testimony, found him guilty.

*Salazar*, 173 Ariz. at 404, 844 P.2d at 571.

. . .

. . .

- 11 -

*Presentencing Proceedings*

One month following Petitioner's conviction, the court held an aggravation/mitigation hearing. In a pre-hearing brief, the prosecution argued that two aggravating factors required imposition of the death penalty: Petitioner committed the murder with the expectation of pecuniary gain, A.R.S. § 13-703(F)(5), and in an especially cruel, heinous, or depraved manner, A.R.S. § 13-703(F)(6). (ROA I at 382-92.)

Defense counsel also submitted a pre-hearing brief. (*Id.* at 352-69.) Consistent with the defense's guilt-phase theory, the memorandum asserted that Petitioner did not participate and was not present when Davis killed the victim. (*Id.* at 354-56.) The defense argued against imposition of the death penalty because the evidence could not conclusively establish that Petitioner killed the victim, it was clear that the jury found Petitioner guilty under the felony murder rule, and the State failed to prove beyond a reasonable doubt that Petitioner killed, attempted to kill, or intended to kill the victim. (*Id.* at 356-57.) Finally, the memorandum urged the court to consider a number of mitigating factors: (1) Petitioner was intoxicated from alcohol at the time of the crime and thus his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the law's requirements was significantly impaired; (2) Petitioner's role in the killing was "relatively minor"; (3) Petitioner could not have reasonably foreseen that his conduct would create a grave risk of death because he believed the house was unoccupied and he and Davis never discussed what they would do if inhabitants were encountered; and (4) Petitioner's young age – twenty-two at the time of the crime – and lack of prior felony convictions (*id.* at 366-68). *See* A.R.S. §§ 13-703(G)(1), (3), (4) & (5).

To buttress the nonparticipation mitigation theory at the presentencing hearing, defense counsel elicited testimony from Petitioner's parents and brother that Petitioner was neither violent nor aggressive. Petitioner's parents testified that Petitioner never got into fights at school or home, did not have a violent temper, and was well regarded by neighbors and employers. (RT 1/14/88 at 6-9, 12–15.) In response to the judge's questioning, Mrs. Salazar acknowledged that Petitioner used marijuana and drank

alcohol, but said she was unaware of him using any other types of drugs or drinking "hard liquor." (*Id.* at 20–21.) She further testified that she had never seen Petitioner change personalities or become aggressive when intoxicated. (*Id.* at 21.)

Petitioner's younger brother, Mauricio, testified that Petitioner got into a lot of fights at school, but most were in defense of Mauricio. (*Id.* at 23.) He and Petitioner began drinking beer and smoking pot in the fifth or sixth grade. (*Id.* at 24.) In junior high, they started doing other types of drugs, including LSD, cocaine, speed, and mushrooms. (*Id.* at 25.) According to Mauricio, Petitioner drank and used drugs up to the time of the crime. (*Id.*) Although Mauricio admitted seeing Petitioner on occasion become violent and "explode" when drunk (*id.* at 30-31), he testified that most of the time Petitioner was "really quiet," "withdrawn," and "would just keep to himself" when intoxicated (*id.* at 26, 31).

### Presentencing Report

Prior to sentencing, the trial judge also received and considered a presentence report (PSR) prepared by the court's probation department. (Doc. 200-1, Ex. 5.)[7] The PSR provided the following social history:

> The defendant was one of three offspring born to Mauricio and Darlene Salazar. Mr. Salazar also reared five stepchildren which were the result of his wife's first marriage. Mr. Salazar was employed for Hughes Aircraft and was able to provide his family with a lower middle class socioeconomic environment. The defendant related that he developed close emotional ties to his parents and siblings. While his juvenile record mentioned that his mother tended to be overprotective, there is no mention of a dysfunctional family environment. In general, the defendant experienced an uneventful and healthy childhood.

(*Id.* at 4.) Petitioner was a poor student, who had to repeat the third and eighth grades. (*Id.* at 5.) "The defendant described himself as 'a mellow person' but confirmed that he had a reputation of being an aggressive fighter in high school." (*Id.*) Petitioner admitted being an alcohol and drug abuser, but claimed to be in sound physical health and denied

---

[7] Petitioner submitted a copy of the PSR, without attachments, as an exhibit to his supplemental brief. The original presentence report, with attachments, was provided to this Court as part of the state court record on appeal ("ROA I").

any psychological difficulties. (*Id.*) "He expressed himself in a calm manner and articulated very well, especially considering his limited education." (*Id.*)

Petitioner's criminal record included several charges as a juvenile, including throwing rocks at a bus, running away from home, fighting with police officers, and stealing a purse.[8] (*Id.* at 3.) Following the purse-snatching incident at age fifteen, he was evaluated by a court appointed psychologist in preparation for sentencing, and this report was included in the PSR for the instant offense. (Doc. 200-3, Ex. 41.) Dr. Cynthia Ginnetti found symptoms of depression resulting from Petitioner's grief at the death of an older brother (who was stabbed in a barroom brawl) and the termination of relationships with a close friend and a girlfriend. However, she found "no formal thought disorder" and recommended that Petitioner seek outpatient mental health treatment for grief and anger. (*Id.* at 2-3.) At the time, Petitioner reported getting along well with his mother but having a strained and distant relationship with his father. (*Id.* at 2.)

The PSR concluded:

> The defendant's involvement in the instant offense is difficult to analyze. Although he does not perceive his family background as dysfunctional, there is considerable evidence that contradicts his perception. He has maintained a pattern of abusing drugs and alcohol since his mid-teen years. Additionally, there are certain incidents, documented in the criminal record section of this report, which reveal the presence of an aggressive personality. His involvement in the instant offense appears to have been an extreme situation, probably facilitated by his severe intoxicated state and the presence of an accomplice.

(Doc. 200-1, Ex. 5 at 6.)

Appended to the PSR were fifteen letters of support from friends, family, and former co-workers. Many of the letters characterized Petitioner as a non-violent person who stayed out of trouble; all described him as a loving person who helped others. (ROA I, PSR, Attachs. (packet of handwritten letters).) Petitioner also submitted a letter. It stated, in pertinent part, that he began using marijuana in the fifth grade and LSD and

---

[8] The PSR also listed residential burglary and auto theft as part of Petitioner's record, but counsel asserted during presentencing arguments, without dispute from the State, that this was an error. (RT 2/8/88 at 18-19.)

cocaine in the seventh grade, his "school days weren't very violent" as he was only in two fights in school and "one after that," he was an "alcoholic" and was using a lot of LSD by the eighth grade, and he would not be "in this mess" if he had not have been "drinking so much liquor that night." (*Id.*) With respect to the murder, Petitioner wrote that "[i]t never crossed my mind to still [sic] or hurt anyone and I did'ent [sic]"; that he told the truth on the stand and had no reason to lie; and that, "I do not see why I have to be put to death, or spend the rest of my life in prison for something I did not do." (*Id.*)

Finally, the PSR included a report from psychologist Catherine Boyer, who at the court's request conducted a general evaluation of Petitioner following his conviction. (Doc. 200-2, Ex. 14.) Other than depression, Dr. Boyer found that Petitioner presented "no indication of any other major mental disorder." (*Id.* at 5.) Testing indicated Petitioner functions in the average range of intelligence, and Dr. Boyer found no gross cognitive deficits. (*Id.* at 2, 5.) In view of Petitioner's drug abuse history, however, Dr. Boyer opined that Petitioner may have some mild neuropsychological impairment. (*Id.* at 2.) Though Petitioner denied any incidents of abuse, or significant family conflicts, Dr. Boyer noted that the difficulties among his siblings "would suggest some degree of family conflict or dysfunction, despite [Petitioner's] generally positive description of family life." (*Id.*) She concluded that chronic and severe substance abuse had been the primary problem throughout Petitioner's life and diagnosed him as in remission from "Alcohol Dependence" and "Drug Abuse (LSD, marijuana, cocaine)." (*Id.* at 5.) In conversations with Dr. Boyer, Petitioner maintained his innocence. He admitted consuming a large quantity of alcohol before entering the victim's home, but denied being present at the time of the murder. (*Id.* at 2.) Dr. Boyer was unable to determine "[t]he extent to which drug or alcohol intoxication may alter [Petitioner's] behavior," but found "some indication that at least in times in the past, he has been aggressive while intoxicated." (*Id.* at 5.)

. . .

. . .

*Sentencing*

Sentencing took place on February 8, 1988, several weeks after the mitigation hearing. Defense counsel Hurd argued against the State's alleged aggravating factors and argued to the court that, in addition to being a mitigating factor, the felony murder rule prevented the court from imposing the death penalty absent a finding beyond a reasonable doubt that Petitioner killed, attempted to kill, or intended to kill the victim. (RT 2/8/88 at 12-13.) In support of its theory that Davis committed the murder, the defense emphasized the following points: (1) Petitioner had been drinking heavily and was very intoxicated when he entered the house, (2) Petitioner did not know the victim and believed the house was unoccupied, and (3) none of the physical evidence implicating Petitioner was found near the bed side of the room by the victim's body. (*Id.* at 8-12.) Counsel also reurged the mitigating factors identified in the presentencing brief: (1) due to his highly intoxicated state, Petitioner lacked the capacity to appreciate the wrongfulness of his conduct; (2) he was a minor participant in the killing; (3) he entered the house believing it to be uninhabited and thus could not have reasonably foreseen that a death would occur; (4) his young age; and (5) his lack of significant criminal record. (*Id.* at 17-18.) In closing, the defense cited Dr. Boyer's report, which described Petitioner as "the type of person who, when confronted with the difficulties of life, retreats. You know, it's a fight-or-flight-type syndrome. His response is flight." (*Id.* at 19.) Based on Petitioner's trial testimony, counsel contended, "that's what he did in this case, Judge." (*Id.*)

Petitioner also addressed the court before sentencing: "Your Honor, I'd like to say I feel really bad about what happened that night. I had no idea that would happen. I didn't kill that poor lady. I pray for her and her family every night. Your Honor, I'd ask you not to give me the death penalty." (*Id.* at 20.)

Following the arguments of counsel, the court entered its findings. With regard to the "especially cruel, heinous or depraved" aggravating factor, the court found that A.R.S. § 13- 703(F)(6) was proven beyond a reasonable doubt based on "the excessive

amount of gratuitous violence on the victim, the senselessness of the murder and the helplessness of the victim." (*Id.* at 36.) Specifically, the court determined that:

. . . the Defendant and Mr. Davis went to the house in the middle of the night where they knew a fragile, elderly woman lived; that they removed the wrought iron on the window that had been placed there for her protection; that at the time that this was occurring, the television was on.

So, the Court determines that there is no doubt that the men knew that the residence was occupied at that point.

The Defendant then went to a relatively secluded part of the residence where she slept.

The Court further finds that the position of the bedroom or sleeping area was such that you could not just accidentally run into her because it was in a relatively secluded portion of the house with only one way to get there.

The Court finds that this was not an accidental interaction with the victim.

The Court further notes that there was a large number of file cabinets and other storage places in the house.

The footprints of two different individuals that were found somewhere on her were – were on her body. Some footprints were on the top of the table wherein the body was found and the footprints were left by different type shoes.

There were a number of file drawers opened and there were numerous and varied areas where valuables, if she had any, could have been hidden.

The Court further notes that there were a number of injuries to Ms. Kaplan implying a number of blows to her face and body, including a blow to her forehead, one behind her ear, one to her mouth, one under the chin, and a blow to her shoulder.

She was a frail person weighing approximately eighty-nine pounds, and was approximately eighty-three years of age.

She was strangled with a telephone cord after the beating, and the telephone cord was looped twice around her neck with great force.

Fingerprints or palm prints of the Defendant Davis and the fingerprints of the Defendant Salazar in what appeared to be blood were found immediately adjacent to where the strangled body was located.

Of the two different kinds of footprints that were found on the table where the body lay, one set was on her body. The other footprint was left on the table where she had been stepped on, and there was an imprint on the arm and the table.

The Court further notes that in addition to Mr. Salazar's fingerprints that was [sic] left in what appeared to be blood, there were scratches on his chest.

Either cruelness of mind or depravity was exhibited by the placement of the telephone back on the receiver while the cord was entwined around Ms. Kaplan's throat.

The Court finds that the forensic evidence indicates that this was a planned, calculated attempt to go to her bedroom. And I believe what occurred afterwards was an attempt to extract, if possible, information of where imagined valuables were hidden. That explains in this Court's view the number of blows and injuries she suffered before she was strangled.

(Id. at 34-36.) The Court did not address, or make any findings regarding, the "pecuniary gain" aggravating factor alleged by the State.

Regarding mitigation, the court found that Petitioner had failed to establish any of the statutory factors set forth in A.R.S. § 13-703(G). (Id. at 36-37.) With regard to the "relatively minor" participant factor in particular, see A.R.S. § 13-703(G)(3), the court expressly found that Petitioner had failed to establish by a preponderance of the evidence that he was not present at the time of the murder. "The facts and circumstances of how the entry was made, where the bedroom was, and the footprints and fingerprints of both Defendants instead show beyond reasonable doubt that both were present when Ms. Kaplan was murdered." (Id.) Addressing non-statutory mitigation, the court found that Petitioner had proven the following factors: (1) lack of a prior felony conviction, (2) "the

fact that alcohol and perhaps other substances were used prior to the break-in," (3) the fact that the jury was instructed on felony-murder, and (4) the question of whether Petitioner engaged in the actual strangulation. (*Id.* at 37-38.) As to the third and fourth factors, the court further found that Petitioner "was a major participant in the felony committed, and that his involvement led to either the actual participation in the strangulation or the other violence perpetrated on the victim, or indicated reckless indifference to human life by the Defendant's actions, when in his presence the victim was being murdered." (*Id.*) Under these circumstances, the court concluded, Petitioner's proven mitigating factors were not sufficiently substantial to call for leniency. (*Id.* at 39.)

On direct appeal, the Arizona Supreme Court upheld the trial court's findings with respect to the "cruel, heinous or depraved" aggravating factor and Petitioner's death eligibility under *Tison v. Arizona*, 481 U.S. 137 (1987) (holding that death penalty may be imposed if a defendant convicted of felony murder was a major participant in the underlying felony and acted with reckless indifference to human life). *Salazar*, 173 Ariz. at 412-13, 844 P.2d at 579-80. As to mitigation, the court discussed each of Petitioner's proffered factors.

Regarding intoxication, the court found that Petitioner was not significantly impaired and appreciated the wrongfulness of his conduct because two witnesses testified at trial that Petitioner did not appear intoxicated; Petitioner testified in detail about what went on in the house, including in which hand he held a lighter to guide himself; and Petitioner "was thinking clearly enough to discard his shoes so that they could not be matched to the prints he knew he had made at the house." *Id.* at 413, 844 P.2d at 580. The court further rejected Petitioner's "attempt to downplay his degree of participation in the crime," reiterating that he was a major participant. *Id.* Similarly, the court rejected Petitioner's claim that he believed the house was unoccupied and therefore could not foresee the victim's death: "After entering the occupied house, defendant either personally beat and strangled the victim or, at the very least, watched or helped while Davis killed her." *Id.* at 414, 844 P.2d at 581. Lastly, the court found that Petitioner's

1   young age was not mitigating in light of his average intelligence, history of juvenile and

2   adult misdemeanor offenses, and his "close and supportive family." *Id.*

3                                    *State PCR Proceedings*

4          In his first state PCR petition, Petitioner argued that defense counsel Hurd and

5   Redondo provided constitutionally deficient representation at sentencing for (1) failing to

6   object to the trial court's consideration at sentencing of evidence produced during co-

7   defendant Davis's trial, (2) not presenting evidence at the mitigation hearing regarding

8   the effects of poly-substance abuse and Petitioner's state of mind, and (3) calling a

9   detrimental witness at the mitigation hearing.  (ROA II at 273-74, 278.)  In support of the

10  petition, PCR counsel proffered an affidavit from Petitioner, which claimed that trial

11  counsel consulted with him only on a limited basis, that he knew of witnesses who could

12  and should have been utilized at sentencing to testify to his character, and that he was

13  extremely intoxicated at the time of the crime and had a long history of alcohol abuse but

14  counsel failed to present expert testimony in this regard at sentencing. (*Id.* at 339.)

15  Counsel also submitted an affidavit from Dr. Crago, who was uncertain why he was not

16  called as a witness.  (*Id.* at 441.)  Dr. Crago avowed that Petitioner "could easily become

17  psychotic" under stress and drug intoxication.  (*Id.*)

18         The trial court conducted a two-day evidentiary hearing on Petitioner's IAC

19  claims. Petitioner called Dr. Crago, PCR investigator Ron Sanchez, and trial counsel

20  Hurd as witnesses. He also proffered an investigative report prepared by Sanchez that

21  included Petitioner's available school records and summaries of interviews between

22  Sanchez and several of Petitioner's friends and family members.  The State submitted the

23  pretrial Rule 11 reports of Drs. Gurland and LaWall and presented the testimony of Dr.

24  Boyer.

25         At the PCR hearing, Hurd explained what his strategy was at sentencing, and why

26  he did not offer Dr. Crago's report at the aggravation/mitigation hearing:

27         [M]y strategy at sentencing wasn't much different from what it had been at
           trial. Our defense the whole time had been that Mr. Salazar did not do it,
28         that though he may be guilty of felony murder or he may be guilty of

> murder because he hung around with Davis, Davis is the one that did it. And that strategy did not change when it came time for sentencing. At no point do I recall presenting any argument or evidence to the Court that, yes, Mr. Salazar did it, but the reasons he did it is because of intoxication or for any other reason. I believe we pretty much stuck to our original defense and that is: If you don't know who did it, Judge, then you can't give this guy the death penalty; give it to the other guy.

(Doc. 212, Ex. D at 137.) Hurd would not have wanted the sentencing judge to know Dr. Crago's conclusion that Petitioner was prone to dangerously assaultive behavior because "it wasn't consistent with the nonviolent nature of [Petitioner] that [the defense was] trying to portray." (*Id.* at 152-53.) Counsel also told the PCR court that he did not investigate Salazar's school or medical records. (*Id.* at 142.)

The PCR court found counsel's strategy of pursuing a nonparticipation defense, including not presenting Dr. Crago as a witness at the sentencing stage, was a reasonable, tactical decision. (Doc. 212, Ex. G at 3.) The PCR court denied Petitioner's motion for rehearing on this issue, explaining that "there were a significant number of points which Dr. Crago's testimony would potentially have undermined for the defense" such that the "dubious benefit of Dr. Crago's testimony to the defense carried with it a significant danger of undermining several portions of the defense's case." (Doc. 212, Ex. H at 1–2.) The Arizona Supreme Court agreed that "not calling Dr. Crago was both professionally reasonable and non-prejudicial." *Salazar*, 173 Ariz. at 416, 844 P.2d at 583.

### Federal Habeas Proceedings

In Petitioner's second amended petition he alleged several instances of ineffective assistance of counsel in preparation for and throughout the sentencing proceedings. (Doc. 114.) Petitioner argued that counsel failed to conduct an investigation into Petitioner's background, to uncover mitigating, psychiatric and childhood information, and to present that information at the penalty phase. (Doc. 114 at 24.) Petitioner further argued that counsel had not provided mental health experts with access to the family and its history, as well as to an honest picture of Petitioner. (Doc. 114 at 25.) These allegations were construed as a failure to investigate and present evidence of Petitioner's social

background (childhood, school records, criminal history, family problems) (Claim A-24) and a failure to provide mental health experts with a complete picture of Petitioner's background (Claim A-27). (Doc. 121 at 11-12.) The Court found Claims A-24 and A-27 procedurally defaulted and rejected Petitioner's argument that the ineffective assistance of PCR counsel could serve to excuse the default. (Doc. 121 at 18–20, 33; *see also* Doc. 133). In addition to Claims 24 and 27, Petitioner alleged that counsel rendered ineffective assistance by continuing the nonparticipation theory at the penalty phase ("Claim A-21") and failing to present evidence of Petitioner's psychological problems and character when intoxicated ("Claim A-22"), both of which "strongly suggested that he was unable to control his violent behavior." (Doc. 137 at 23-24.) Finding Claims A-21 and A-22 properly exhausted, the Court considered the claims on the merits.

Reviewing the evidence, this Court rejected Petitioner's contention that Hurd failed to conduct an investigation or confer with anyone about the mitigation strategy. (Doc. 177 at 39.) The Court also rejected Petitioner's conclusory assertions that counsel failed to investigate mental impairment and intoxication as potential mitigating factors. (*Id.*) The Court found Petitioner's assertion that counsel neglected to investigate and present evidence regarding Petitioner's "dysfunctional" upbringing, history of drug and alcohol abuse, good character when sober, and good conduct during pretrial incarceration not properly exhausted. (*Id.* at 39 n.17.) The Court also explained that this argument was based on evidence that was in fact before the sentencing judge via the reports of Drs. Boyer and Ginnetti and the presentence report, including the letters from friends and family appended thereto. (*Id.*) Finally, the Court found that the evidence supported counsel's decision to continue the nonparticipation theory at the penalty phase in lieu of admitting guilt and asserting that voluntary intoxication rendered him unable to control his conduct. (Doc. 177 at 46.) The Court denied the habeas petition, and granted a certificate of appealability as to Claims A-21 and A-22. (Doc. 177 at 69.) Petitioner appealed this Court's decision denying relief, and review of these claims remains pending before the Ninth Circuit while this Court reconsiders Claims A-24 and A-27 on limited

remand. (*See* Doc. 195.)

Relying on new evidence submitted with his supplemental brief, Petitioner now asserts that if sentencing counsel or PCR counsel had conducted an adequate mitigation investigation, they could have presented a more complete and compelling mitigation picture, and that there was no reasonable strategic reason for counsel not to do so. Specifically, Petitioner asserts that his background is "filled with mitigating information," in particular a severely dysfunctional family background, supportive of a diagnosis of Fetal Alcohol Syndrome ("FAS") (Doc. 200 at 13–14.) Petitioner experienced significant problems in school and suffered intense and frequent headaches from a very young age and used to bang his head as a young child. (*Id.*, Ex. 12 at ¶ 2–3; Ex. 13 at ¶¶ 7–8; Ex. 45.) Petitioner's parents were heavy drinkers who left their children unsupervised. (*Id.*, Ex. 86 at ¶¶ 4–5, Ex. 84 at ¶ 11, Ex. 31 at ¶ 14.) Petitioner's mother drank excessively throughout her entire pregnancy. (Doc. 200, Ex. 18 at ¶ 8; Ex. 84 at ¶3; Ex. 108 at ¶2-3; Ex. 31 at ¶ 3.) Beginning at very early ages, Petitioner, and almost all of his siblings, had alcohol or substance abuse issues. (*Id.*, Ex. 86 at ¶ 6; Ex. 111 at ¶¶ 4 and 8; Ex. 31 at ¶¶ 13, 20-21.) Petitioner's parents were harsh, mean, emotionally distant and abusive, and physically punished and humiliated their children. (*Id.*, Ex. 84 at 7, 11; 86 at ¶¶ 4, 5, 6, 10; Ex. 31 at ¶¶ 7, 9, 10, 12.) Petitioner was sometimes locked outside the home, and had to find food and shelter on his own. (*Id.*, Ex. 31 at ¶ 8.) "Random" people, many of them drunks, passed through Petitioner's crowded household, which consisted of Petitioner, his parents, and eight other children in a three bedroom house. (*Id.*, Ex. 31 at ¶ 14–15.) Some of these outsiders molested the children in the home, and there was sexual abuse among the siblings. (*Id.*, Ex. 31 at ¶¶ 16, 28.)

Dr. Crago now states that, in preparing his report during the trial, which was limited to the purpose of evaluating guilt phase defenses, he was provided with very little collateral information regarding Petitioner and his background. (Doc. 200-1, Ex. 1 at ¶ 1.) Dr. Crago declares that, having now reviewed the additional documentation, there is evidence of broad psychopathology in Petitioner's background:

> [Petitioner's] mother was a heavy drinker throughout his pregnancy. [Petitioner] manifested odd behaviors such as head banging and did not fit in with the rest of the family. He struggled in school and appeared to have a learning disability. He had significant problems with headaches which were never addressed medically. The importance of this information is that individuals who have damage to their central nervous system such as the effects of alcohol on the fetus and/or the effects of constant head banging not only have difficulty with cognitive tasks but also with emotional regulation. Specifically they often had difficulties with impulse control and judgment. These injuries or deficits may have influenced [Petitioner] at the time of the crime.

(Doc. 200-1, Ex. 1 at ¶ 4.)

Dr. Crago states that had he been provided with this critical background information, he could have presented a report about the high level of family dysfunction in Petitioner's household, and explained that this level of dysfunction likely exacerbated Petitioner's neuropsychological problems. (*Id.*, Ex. 1 at ¶ 5.)

At federal habeas counsel's behest, neuropsychologist Antonio E. Puente, Ph.D., evaluated Petitioner by conducting multiple interviews, neuropsychological testing, and an extensive record review, including Petitioner's legal history, family and developmental history, psychological and psychiatric evaluation and history, education records, and medical history. (*Id.*, Ex. 12.) Dr. Puente also interviewed members of Petitioner's family and concluded that the "overall impression of the family is that it consisted of chaos and psychopathology." (*Id.*, Ex. 12 at 3.) Dr. Puente found a significant historical record of psychopathology on the part of most of the family members, and that depression, familial abuse, and alcoholism were rampant among family members. (*Id.*, Ex. 12 at 4.) Dr. Puente opines that the likelihood of FAS was suggested by the evidence that Petitioner's mother consumed large quantities of alcohol during her pregnancy with Petitioner. (*Id.*, Ex. 12 at 10.) Dr. Puente explains that the results of testing reveal "significant problems with learning and memory, attention, and problem solving/organization (i.e., executive functions). There is evidence of learning disability." (*Id.*, Ex. 9 at 12.) Petitioner's "[i]ntelligence scores range from mild intellectual deficiency (retardation) to low normal . . . major deficiencies are found when

novelty, time and stressful situations require engagement of executive functions." (Id. at 9.)

Dr. Puente further opines that the integration of extensive historical and face-to-face as well as collateral interviews together with the administration of numerous neuropsychological tests reveals "a powerful, consistent, and historically, as well as scientifically, validated conclusion . . . of long-standing and serious brain dysfunction, beginning before birth, and evolving into subsequent learning disability and intellectual limitations, poly-substance abuse, and significant pervasive mental disorder, which is in the form of depression and psychosis." (Doc. 200-1, Ex. 12, at 10.) Dr. Puente has diagnosed Petitioner with Fetal Alcohol Syndrome, Borderline Intellectual Deficiency, Learning Disability, History of Alcohol and Poly-substance Abuse, Major Depressive Disorder, Mixed Personality Disorder, Mild Cognitive Impairment, and Psychosis, Not Otherwise Specified. (Doc. 200-1, Ex. 12 at 10-11.)

**III.   Scope of Remand**

Respondents assert that Petitioner's supplemental briefing reaches beyond the scope of remand to impermissibly attack the state court's ruling on Claims A-21 and A-22, claims which were previously denied by this Court and are currently pending appeal in the Ninth Circuit. (Doc. 212 at 12.) The Court disagrees.

"The rule of mandate requires a lower court to act on the mandate of an appellate court, without variance or examination, only execution." *United States v. Garcia-Beltran*, 443 F.3d 1126, 1130 (9th Cir. 2006) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). Thus, in the instant matter, the Court cannot address the issues raised by Petitioner in his supplemental briefing if so doing would exceed the boundaries as delineated by the mandate. However, "courts are often confronted with issues that were never considered by the remanding court." *United States v. Kellington*, 217 F.3d 1084, 1093 (9th Cir. 2000) (citing *Biggins v. Hazen Paper Co.*, 111 F.3d 205, 209 (1st Cir. 1997)). Thus, upon receipt of a mandate this Court is free to do anything not "foreclosed by" the mandate or that does not run counter to the "spirit" of the circuit court's decision.

1   *Cassett v. Stewart*, 406 F.3d 614, 621 (9th Cir. 2005) (quoting *Kellington*, 217 F.3d at

2   1092-93)). Additionally, though not cited by Respondents but arguably applicable in this

3   case, the "law of the case doctrine," generally precludes courts from exercising their

4   discretion to reconsider an issue previously decided by the same court. *See Milgard*

5   *Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990). Because

6   the supplemental briefing does not ask this Court to re-examine its previous ruling,

7   neither the "rule of mandate" nor the "law of the case doctrine" preclude this Court from

8   examining counsel's alleged ineffective performance raised in the supplemental briefing.

9        As Respondents point out, at issue in this Court's previous ruling was sentencing

10  counsel's strategy of pursing a nonparticipation theory at sentencing and not presenting

11  Dr. Crago as a mitigation witness. Critical to this Court's ruling denying those claims was

12  the state court's factual finding that defense counsel's decision to do so was tactical—a

13  decision counsel made because he feared that Dr. Crago's testimony would have

14  potentially undermined the defense strategy by highlighting differences between

15  Petitioner's trial testimony and statements that were made to Dr. Crago, and would have

16  presented Petitioner as "reactive" with "aggressive or hostile impulses." (*See* Doc. 177 at

17  34-37) (citing ROA II at 253–54)). Further, this Court found that Dr. Crago's testimony

18  would have been valuable only to the extent Petitioner could show he was extremely

19  intoxicated at the time of the crime, and there was little reliable evidence to support this

20  contention. (*Id.* at 43.)

21       Respondents assert that Petitioner's new evidence simply bolsters Dr. Crago's

22  previous opinions and is cumulative to the evidence of neurological impairments

23  presented in support of the exhausted claims. This contention is contradicted by the

24  evidence. Dr. Crago prepared his report in reliance primarily on Petitioner's self-

25  reporting. The report presented a clinical picture of a "disturbed individual" with a mixed

26  personality disorder and clear demonstration of schizophrenic tendencies (*see* Doc. 200-

27  1, Ex. 3), and Dr. Crago's "opinion that Petitioner may not have been in control of his

28  conduct hinged on whether Petitioner was actually intoxicated." (Doc. 177 at 47.)

However, in direct contrast to the present factual allegations suggesting Petitioner suffers significant neurological impairments of FAS and organic brain damage, Dr. Crago explained in his 1987 report that he found no evidence to suggest Petitioner's cognitive functioning was affected by residual brain damage or that his performance was affected by educational deficits. That Dr. Crago's proffered declaration seems to contradict this conclusion may perhaps be explained by Dr. Crago's acknowledgment that the information he received at the time he prepared his 1987 report was in direct contrast to the information he has now received about the high level of family dysfunction in Petitioner's household. (*See* Doc. 200-1, Ex. 1 at ¶ 5.) Accordingly, the Court concludes the new evidence is not merely cumulative because the evidence goes beyond "simply bolster[ing] Dr. Crago's opinions" (*see* Doc. 212 at 14), by contradicting some of the factual allegations asserted in Petitioner's exhausted claims of ineffective assistance at sentencing, and alleging, specifically, that counsel failed to investigate and present substantial mitigating evidence that, if presented to a mental health expert, would have suggested a diagnosis of FAS and organic brain damage.

Petitioner asserts in his supplemental reply brief that the "whole point of [Petitioner's] *Martinez* claim is that his mental health diagnoses and background evidence was not accurately presented at sentencing or at post-conviction," and that the "claims presented now contrast significantly with the bare-bones presentation at post-conviction." (Doc. 217 at 10–11.) Petitioner suggests that this new evidence places Petitioner's claims in a significantly stronger evidentiary posture, permitting them to benefit from *de novo* review under *Martinez*. (*Id.* at 11) (citing *Dickens*, 740 F.3d at 1317–20). In *Dickens*, the court held that a petitioner can establish that a "previously exhausted IAC claim" may be altered, rendering the claim unexhausted and potentially barred from federal review, "if new factual allegations either fundamentally alter the legal claim already considered by the state courts, or place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." 740 F.3d at 1318–19 (citations and internal quotation marks omitted). The Court agrees

that the specific factual allegations of deficient performance raised by Petitioner in the supplemental briefing—the failure to investigate evidence of Petitioner's dysfunctional family background and provide that evidence to mental health experts—render these sentencing IAC claims quite distinct from the claims the state court decided and that this Court previously denied.

Specifically, the focus of the claims this Court previously ruled on was whether sentencing counsel was ineffective for failing to present mental health evidence from Dr. Crago that would have established that Petitioner was extremely violent and volatile when intoxicated. This bears little resemblance to the newly-developed IAC claim presented here—that counsel failed to conduct a complete social background investigation which would have provided mental health experts with information necessary to suggest and support a diagnosis of FAS and organic brain damage. Accordingly, the newly-developed claim is significantly different and features stronger evidence of potentially overlooked mitigation than evidence of Petitioner's propensity towards violence when intoxicated. *See Dickens*, 740 F.3d at 1317–19 (finding that general allegations concerning sentencing counsel's failure to "direct the work of the court-appointed psychologist" and adequately investigate petitioner's background bear little resemblance to allegations that suggest petitioner suffered from FAS and organic brain damage).

As the Court has pointed out, the claims Petitioner exhausted raised only *conclusory* assertions that counsel failed to investigate mental impairment and the possibility that Petitioner became violent when intoxicated during sentencing. (Doc. 177 at 39.) Petitioner now presents more specific, compelling, and fundamentally different allegations of IAC than previously raised and decided by the Court. Thus, the Court rejects Respondents' assertion that these issues are outside the scope of remand because they have already been decided by the Court and are pending review on appeal.

Petitioner's new factual allegations and new evidence, however, raise an issue not addressed in the supplemental briefing by either party: whether the new facts and

evidence presented in this supplemental briefing, which were not previously alleged in Petitioner's second amended petition, are properly before the Court in the first instance. Pursuant to Rule 2(c) of the Rules Governing Section 2254 Cases, a petitioner is obligated to specify in a federal habeas petition all grounds for relief, as well as the facts supporting each of these grounds. *See Mayle v. Felix*, 545 U.S. 644, 661 (2005) (observing that Rule 2(c) requires pleading "separate congeries of facts" in support of each ground for relief); *Blackledge v. Allison*, 431 U.S. 63, 75 n. 7 (1977) (observing that "notice" pleading in habeas is insufficient and that petition "is expected to state facts that point to a 'real possibility of constitutional error'") (quoting Advisory Committee Note to Rule 4, Rules Governing Section 2254 Cases).

A plain reading of the factual allegations in the second amended petition and the supplemental briefing demonstrates that the claims have little in common other than the basic premise that sentencing counsel failed to conduct a constitutionally sufficient investigation into relevant mitigating evidence. The second amended petition asserted ineffectiveness based on the "failure to conduct an investigation into Petitioner's background, to uncover and present mitigating psychiatric and childhood information, and to present that information at the penalty phase" of Petitioner's trial, but did not elaborate on what the consequence of this failure was—what historical information an investigation would have uncovered and what the mental health experts might have done had they been provided with that information. (*See* Doc. 114 at 24–25.) Neither did the second amended petition allege any failure to uncover evidence of specific, severe family dysfunction[9] or specific neurological impairments. (*See id.*) It appears that Petitioner's allegations concerning counsel's failure to investigate Petitioner's social background and provide that information to mental health experts, effectively state new claims for relief. Petitioner has not requested permission to amend, and it is unclear whether amendment

---

[9] Petitioner did provide detail regarding the stabbing death of his brother and the effect it had on Petitioner and his family, as well as a chronicle of Petitioner's drug and alcohol abuse and addiction in his opening brief on the merits of his habeas petition. (*See* Doc. 137 at 24–25.)

would be warranted under Rule 15 of the Federal Rules of Civil Procedure. *See Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (undue delay and futility are considerations in determining whether district court abused discretion in denying amendment of 28 U.S.C. § 2254 habeas corpus petition); *see also Lindauer v. Rogers*, 91 F.3d 1355, 1357 (9th Cir. 1996) (post-judgment Rule 15(a) motion to amend may only be considered if judgment first reopened under Rule 59 or 60).

As a result of the new allegations raised in Petitioner's supplemental *Martinez* brief, the Court finds that additional briefing is necessary to determine whether the allegations are properly before the Court. The parties are therefore directed to file simultaneous briefs, limited to seventeen pages, on the following issues:

(1)     Do Claims A-24 and A-27, as alleged in the supplemental brief, raise new claims that were not alleged in the second amended petition?

(2)     If so, is amendment of the second amended petition to include the new factual allegations appropriate at this stage of the habeas proceedings?

The Court discourages repetition of facts and argument already briefed; the parties should instead simply reference prior pleading as necessary. As previously mentioned, the parties may also include briefing on the impact of the recent decision in *Runningeagle v. Ryan* on the Court's determination whether *Martinez* is applicable to Petitioner's claims.

Accordingly,

IT IS ORDERED that, no later than thirty (30) days following the filing of this Order, the parties shall each file a brief, not in excess of seventeen (17) pages, regarding the two issues set forth above.

. . .

. . .

. . .

. . .

. . .

1     IT IS FURTHER ORDERED that the parties may choose to address the impact of

2 *Runningeagle v. Ryan*, No. 07-99026, 2016 WL 3213095 (9th Cir. June 10, 2016) on the

3 applicability of *Martinez* to Petitioner's claims in their supplemental briefing.

4

5     Dated this 7th day of July, 2016.

6

7

8 _____

9 Frank R. Zapata

10 Senior United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28